UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DEUTSCHE TELEKOM AG, | | |
| | Petitioner, | |
| vs. | | Civil Action No. |
| AIR INDIA, LTD, | | |
| | Respondent. | |

## PETITION TO CONFIRM ARBITRATION AWARD AND COMPLAINT FOR DECLARATORY JUDGMENT

Petitioner Deutsche Telekom AG ("Petitioner" or "DT"), by and through its undersigned counsel, brings this action against defendant Air India, Ltd. ("Air India"), as the alter ego of the Republic of India ("India").  Petitioner alleges as follows:

## NATURE OF THE ACTION

1.      This is an action pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention"), codified in Chapter 2 of the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. § 201, for recognition and confirmation of the final and binding arbitration award rendered on May 27, 2020 against India by a tribunal sitting in Geneva, Switzerland ("Tribunal") under the auspices of the Permanent Court of Arbitration ("PCA").  *See* Boykin Decl. Ex. 1, *Deutsche Telekom AG v. The Republic of India*, PCA Case No. 2014-10, Final Award (May 27, 2020) ("Award").  Petitioner seeks to enforce the Award against India's wholly-owned and controlled national airline, Air India, as the alter ego of India.  In addition, Petitioner seeks declaratory relief pursuant to 28 U.S.C. § 2201 and the Federal Rule of Civil Procedure 57 to determine and resolve an immediate and actual controversy regarding the relationship between India and Air India, and in particular, for a determination that Air India is the alter ego of India.

2.      Petitioner is an indirect minority shareholder in an Indian company called Devas Multimedia Private Ltd. ("Devas").   In February 2011, India unilaterally annulled a major commercial agreement between Devas and Antrix Corporation Ltd. ("Antrix"), an Indian state-owned company acting as the commercial arm of the Indian space ministry, thereby wiping out the value of Petitioner's investment in Devas.  The Award sought to be enforced herein was entered in arbitral proceedings subsequently brought by Petitioner pursuant to a bilateral investment treaty between the Federal Republic of Germany and the Republic of India, *i.e.*, the Agreement between the Federal Republic of Germany and the Republic of India for the Promotion and Protection of Investments signed on July 10, 1995 ("Germany-India BIT" or "Treaty").  *See* Boykin Decl. Ex. 2, 2071 U.N.T.S. 121.

3.      In an Interim Award issued on December 13, 2017, the arbitral Tribunal found in favor of Petitioner both on jurisdiction and liability.  It unanimously rejected several jurisdictional objections raised by India.  Boykin Decl. Ex. 3, *Deutsche Telekom AG v. The Republic of India*, PCA Case. No. 2014-10, Interim Award (Dec. 13, 2017) ("Interim Award").  First, the Tribunal rejected India's jurisdictional objection that the Treaty contained its consent to arbitrate disputes only in respect of investments in India that German investors held directly, and that India's consent to arbitration of investment disputes in Article 9 of the Treaty did not extend to DT's investment, because DT held its interest in Devas indirectly through its Singaporean subsidiary, DT Asia.  *Id*. ¶¶ 138-53.  The Tribunal declined to read any such limitation into the Treaty's definition of investment.  *Id*. ¶¶ 139-41.  It found that the Treaty contains a broad definition of "investment," which does not distinguish between investments held directly and those held indirectly through intermediary companies.  *Id*.  The Tribunal noted that indirect investments are very common, and it would not comport with the object and purpose of the Treaty to limit the categories of protected

investments to only those investments directly held by the foreign investor.  *Id.* ¶¶ 142-43.  Second, the Tribunal considered and rejected India's objection that it had consented to arbitrate disputes only in respect of investments that have been "established" and specifically admitted by the host state, whereas DT had not moved past the "pre-investment" stage.  *Id.* ¶¶ 158-65.  Third, the Tribunal considered and rejected India's argument that, under Article 12 of the Treaty, India's "essential security interests" operated as an absolute defense to DT's claims of breach.  *Id.* ¶ 183.

4.     After carefully considering and overruling each of India's objections to the arbitral Tribunal's jurisdiction and affirming its jurisdiction to adjudicate the dispute between Petitioner and India under Article 9 of the Treaty, the Tribunal unanimously found that India's decision to annul that contract breached the obligations that India owed Petitioner's investment under the Treaty.  *Id.*, ¶¶ 337, 390.

5.     On January 29, 2018, India applied to the Swiss Federal Supreme Court – the highest court in Switzerland with original jurisdiction to hear challenges to awards in arbitrations seated in Switzerland – to set-aside the Interim Award.  On December 11, 2018, the Swiss Court rejected India's annulment application, finding that the Tribunal had correctly concluded that it had jurisdiction under the Treaty, and that it had conducted the arbitration proceedings fairly.  Boykin Decl. Ex. 4, Swiss Federal Supreme Court, Judgment of December 11, 2018 ("Swiss Court Decision").

6.     Meanwhile, the arbitration proceeded to the final phase and the Tribunal issued the Award in favor of Petitioner, ordering India to pay USD 93.3 million in damages, plus arbitration costs, legal fees, and interest, for a total of USD 132 million as of May 27, 2020.  Boykin Decl. Ex. 1 at ¶ 357.

7.      India has refused to pay the amounts due under the Award and interest has continued to accrue, such that the total amount owed by India as of the date of the filing of this Complaint is USD 137.5 million.  Pursuant to the Award, interest will continue to accrue until the award has been "paid in full."

8.      The Award is now binding, enforceable and not subject to challenge, annulment or appeal in any court or tribunal.  India did not seek to set-aside the Award in the Swiss Federal Supreme Court, and the 30-day deadline for it to make such a challenge under Swiss law has long passed.  *See* Boykin Decl. ¶¶ 8-13.  On August 20, 2020, the Civil Court of the Republic and Canton of Geneva certified that the Award was enforceable.  *See* Boykin Decl. Ex. 5, Certificate of Enforceability from the Civil Court for the Republic and Canton of Geneva ("Certificate of Enforceability".  Petitioner has brought a separate enforcement against India in the United States District Court for the District of Columbia that is currently pending.  *Deutsche Telekom AG v. Republic of India*, Case No. 21-cv-01070 (D.D.C. Apr. 19, 2020) ("*DT v. India*").

9.      The Award is subject to the New York Convention.  Pursuant to Chapter 2 of the FAA, which implements the New York Convention into U.S. law, the merits of the underlying dispute are not subject to being contested or relitigated in this Court.  9 U.S.C. § 207.  Rather, the court should confirm the Award unless Respondent can demonstrate that one of the very limited grounds for non-recognition is present.  *Id*.  No ground for declining recognition is present here.

10.     The Award should be confirmed and enforced against Respondent Air India because the facts leave no doubt that it is a commercial instrumentality and alter ego of the Republic of India.  The Second Circuit has held that a petitioner may seek to enforce an arbitral award against "a third party not named in an arbitral award . . . under a theory of alter-ego liability" and that such question is governed by "the law of the enforcing jurisdiction, here the Southern

District of New York." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 75 (2d Cir. 2017). The Supreme Court established the relevant standard for alter-ego liability in *First National City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), in which it held that a judgment creditor of a foreign sovereign may look to an instrumentality of the sovereign debtor for satisfaction of a judgment either when the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created," or when giving effect to the ostensible separate legal status of the state and its instrumentality would work a "fraud or injustice." 462 U.S. 611, 629 (1983) (internal citations omitted).

11. Since *Bancec*, courts have developed five so-called "*Bancec* factors" to aid their analysis: "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 823 (2018) (citations and internal quotation marks omitted). These factors are applied on a case-by-case basis rather than a "mechanical formula" for determining extensive control. *Bancec*, 462 U.S. at 633.

12. Air India is wholly-owned and controlled by India. India's control over Air India is wide-ranging, extending throughout Air India's legal existence to its day-to-day operations and its financial affairs. India dominates Air India in governance matters large and small by, among other things: controlling, appointing, and having the power to remove Air India's officers and directors; determining whether, when, and from whom Air India acquires fleet equipment; dictating the airline's operational policies, from wages for its employees, to fares charged, and

routes to offer; and making regular intrusive demands for information regarding operations.  India entrenches these powers by making Air India dependent on grants, loans, and guarantees from India for its financial survival.

13.     Here, the extensive control of Air India by India establishes that an alter ego relationship exists between them.  In addition, it would give rise to fraud and result in injustice to give effect to the legal fiction that Air India and India are technically separate.

## THE PARTIES

14.     Petitioner, DT, is a corporation organized and existing under the laws of the Federal Republic of Germany ("Germany").  It is one of the largest telecommunication companies in the world.  Germany owns a 31.9% shareholding in DT.

15.     Respondent, Air India, is the national airline of India.  It is a foreign corporation incorporated under the laws of India, and is wholly owned and controlled by India.  Air India, as an agency or instrumentality of India, is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA").  28 U.S.C. § 1603.  Air India operates in the United States and does substantial business in this judicial district, where its United States operations are headquartered.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this proceeding because it is an action to enforce an international arbitration award under the New York Convention and therefore is "deemed to arise under the laws and treaties of the United States."  9 U.S.C. § 203.

17.     This Court also has subject matter jurisdiction because this action is brought against a foreign state within the meaning of 28 U.S.C. § 1603 and, as explained below, the state does not enjoy immunity from jurisdiction under the FSIA.  28 U.S.C. § 1330(a).

18.     Air India is not entitled to assert sovereign immunity for three independent reasons. First, Air India is not immune because its alter ego, India, is a party to the New York Convention and to the agreement to arbitrate contained in the Treaty, thereby waiving immunity in any proceedings to confirm the Award.  28 U.S.C. 1605(a)(1) (no immunity where "the foreign state has waived its immunity either explicitly or by implication"); *Blue Ridge Inv., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 84 (2nd Cir. 2013) (holding that a foreign sovereign implicitly waived its immunity "by becoming a party to the [New York] Convention").  Second, Air India is not immune because this proceeding is an action to "confirm an award made pursuant to . . . an agreement to arbitrate" and the award is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards," *i.e.*, the New York Convention.  28 U.S.C. 1605(a)(6).  Third, India is not immune because this dispute involves "commercial activity carried on in the United States" or "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere."  28 U.S.C. 1605(a)(2).  The basis of this action originated with activity—discussions with the Indian Space Authorities regarding a potential investment related to the commercialization of India's S-band spectrum—that occurred in the United States.  *See* Boykin Decl. Ex. 3, Interim Award, ¶ 54.  A significant portion of Petitioner's shareholding in Devas is held by venture capital and private equity funds in the United States.  In addition, the property on which Petitioner seeks to enforce the Award—Air India's assets—is held in furtherance of commercial activity carried out in the United States.

19.     This Court will have personal jurisdiction over Air India as soon as service is effected pursuant to 28 U.S.C. § 1330(b), which extends personal jurisdiction over a foreign state

that is not immune from suit and that has been properly served with process pursuant to 28 U.S.C. § 1608.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(l) and (3) because Air India resides and conducts business in this District.  Specifically, Air India's United States operations are headquartered in this District at 570 Lexington Avenue, New York, New York, 10022.  In addition, Air India holds property in this District against which Petitioner expects to enforce its anticipated judgment.

21.     This Petition was timely filed because the Award was made less than three years ago, on May 27, 2020.  9 U.S.C. § 207.

## STATEMENT OF FACTS

### I.   The Underlying Dispute

22.     In January 2005, Devas entered into a twelve-year agreement with Antrix Corporation Limited ("Antrix"), an Indian state-owned enterprise (the "Devas-Antrix Agreement").  Boykin Decl. Ex. 3, Interim Award, ¶¶ 59, 61.  The Devas-Antrix Agreement provided that Antrix would lease 70 MHz of electromagnetic spectrum, specifically "S-band" capacity, to Devas for the purpose of providing broadband wireless access and audio-visual services throughout India.  *Id*. ¶¶ 5, 59.  On February 2, 2006, after Antrix received necessary governmental approvals, the Devas-Antrix Agreement entered into force.  *Id*. ¶ 62.

23.     On August 18, 2008, DT, through its Singaporean subsidiary, made a USD 75 million equity contribution in exchange for 17.2% of the shares of Devas.  *Id*. ¶ 69.  In the following year, on September 29, 2009, DT made a further equity contribution in Devas of USD 22.2 million.  *Id*. ¶ 70.  Following subsequent changes in DT's investment and Devas's shareholding, DT's shareholding in Devas increased to 19.62%.  *Id*.

24.     Around the same time, India quietly initiated the process of scuttling the Devas-Antrix project in response to public criticism of the Indian government's liberal allocation of various types of spectrum and accusations of corruption in connection with the lease of 2G spectrum in a separate agreement unrelated to Devas.  *Id*. ¶¶ 75-76, 339, 343-44.  Despite the fact that such accusations were unrelated to the Devas-Antrix Agreement, in early 2011, India announced its decision to annul the Devas-Antrix Agreement.  *Id*. ¶ 79-91.  India stated that the annulment was based on the policy decision to preserve the S-band spectrum for the strategic and societal needs of the Indian state.  *Id*. ¶¶ 90, 272.  As instructed by India, on February 25, 2011, Antrix unilaterally terminated the Devas-Antrix Agreement.  *Id*. ¶ 92.

## II.     Arbitration Proceedings Challenging India's Action

25.     Devas and its shareholders have pursued multiple arbitration proceedings seeking to recover damages and lost profits that they have suffered as a result of India's cancellation of the Devas-Antrix Agreement.  Immediately following the cancellation, Devas brought a commercial arbitration against Antrix pursuant to the Devas-Antrix Agreement.  Shortly thereafter, shareholders of Devas incorporated in the Republic of Mauritius (the "Mauritius Investors") brought arbitration proceedings against the state of India pursuant to a treaty between Mauritius and India.  Two of the three Mauritius Investors, CC/Devas (Mauritius) Ltd and Telcom Devas Mauritius Limited, are controlled by U.S.-based venture capital firms, Columbia Capital and Telecom Ventures.  Petitioner then brought arbitration proceedings against India under the Germany-India BIT, which resulted in the Award that is the subject of this action.

### A.  The Devas-Antrix Arbitration

26.     On June 19, 2011, Devas initiated a commercial arbitration against Antrix before the International Chamber of Commerce ("ICC") pursuant to the arbitration clause of the Devas-

Antrix Agreement, seeking specific performance, and in the alternative, damages arising out of wrongful termination. *Id*. ¶ 101.  On September 15, 2015, the ICC tribunal issued a final award, which ordered Antrix to pay USD 562.5 million plus interest to Devas. *Id*. ¶ 102.  On December 7, 2017, Antrix filed an action for annulment of the ICC award before Indian courts, which is still pending as of today, 10 years after the arbitration was commenced and without the slightest visibility on timing for resolution.  Boykin Decl. Ex. 1, Award, ¶ 322.  In October and November 2020, the District Court for the Western District of Washington entered an order confirming the award and entered a $1.29 billion judgment in favor of claimants in that arbitration.  *Devas Multimedia Private Ltd. v. Antrix Corp. Ltd.*, No. 18-cv-01360 (W.D. Wash.),[1] ECF No. 49 (Order Confirming Award (Oct. 27, 2020)) and ECF No. 52 (Judgment (Nov. 4, 2020)).  Antrix has appealed the district court's order and refuses to pay the judgment.  *Id*. at ECF No. 133, at 2 (Order (Aug. 16, 2021)).   In 2021, in response to Antrix's petition, an Indian state agency initiated the process of liquidating Devas, stripped the Devas Board of Directors of its authority, and appointed a government official as provisional liquidator of Devas.  *See supra* ¶¶ 38, 130-132.  After India assumed control over both Antrix and Devas through these steps, the court granted a  motion to intervene brought by Devas' U.S. shareholder and issued a Temporary Restraining Order against Devas (now under control of the "Provisional Liquidator") to prevent the Provisional Liquidator from "jeopardize[ing] enforcement of the Award in the United States."  *Devas Multimedia Private Ltd., v. Antrix Corp*., Case No. 2:18-cv-01360-TSZ, Order (February 24, 2021) *Antrix* ECF No. 76.  Devas has

---

[1]     Citations in the form "*Antrix* ECF No.__" refer to the docket number of the exhibits submitted in the *Devas v. Antrix* proceedings.

### B.  The Mauritius Investors' India Arbitration

27.     In addition, in 2012, the Mauritius Investors commenced an arbitration against India in the Permanent Court of Arbitration pursuant to the Agreement Between the Republic of India and the Republic of Mauritius for the Promotion and Protection of Investments ("India-Mauritius BIT").  On July 26, 2016, the tribunal found India liable under the treaty.  *See* Interim Award, ¶ 35.  After India unsuccessfully attempted to set-aside the award in The Netherlands before The Hague District Court, *id*. ¶¶ 43-44, it appealed to The Hague Court of Appeal.  That appeal is still pending and any decision by The Hague Court of Appeal is subject to review by the Supreme Court of The Netherlands.  Meanwhile, the tribunal in the underlying arbitration issued its final award on October 13, 2020 ordering India to pay the Mauritius Investors $ 111,296,000 in damages, plus pre- and post-award interest, as well as $ 10,000,000 in legal and arbitration costs.  The claimants in that arbitration are currently seeking to enforce that award in proceedings before the United States District Court for the District of Columbia.  *See CC/Devas (Mauritius) Ltd. et al v. Republic of India*, Case No. 1:21-cv-00106-RCL (D.D.C. Jan. 13, 2021).  In addition, as detailed in section IV below, those same claimants have also filed suit in this Court seeking to enforce the award against Air India as an alter ego of India.

### C.  Petitioner's Arbitration Against India

28.     India and Germany undertook specific obligations in the Germany-India BIT to protect investments in their territory made by investors of the other party to the Treaty.  Boykin Decl. Ex. 2, Germany-India BIT, Arts. 3-8.  In addition, under Article 9 of the Treaty, "[a]ny dispute between an investor of one Contracting Party and the other Contracting Party in connection with an investment in the territory of the other Contracting Party . . . may refer such dispute to arbitration in accordance with the United Nations Commission on International Trade Law Rules

on Arbitration[.]" *Id.* Art. 9.  Article 9 of the Treaty operates as a standing offer by the Contracting Parties to the Treaty (India and Germany) to arbitrate disputes with investors from the other country arising out of investments made in their territory.  *See BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 35-6 (2014) (finding that Article 8 of the bilateral investment treaty between the United Kingdom and Argentina creates a contractual duty to arbitrate, and its local litigation requirement is a mere procedural precondition).  As explained below (*see infra* ¶ 29 et seq.), Petitioner's arbitration against India is in accordance with Article 9 of the Treaty.

29.     On September 2, 2013, after India breached its obligations under the Treaty by unilaterally annulling the agreement with Devas, Petitioner accepted India's standing offer to arbitrate disputes with German investors concerning investments in India by submitting its Notice of Arbitration in accordance with Article 9 of the Treaty.  *See* Boykin Decl. Ex. 3, Interim Award ¶¶ 6, 10.

30.     On April 11, 2014, a three-member tribunal was constituted, made of three highly distinguished arbitrators: Mr. Daniel M. Price, appointed by DT; Professor Brigitte Stern, appointed by India; and Professor Gabrielle Kaufmann-Kohler, the presiding arbitrator appointed by the Parties upon proposal of the Secretary General of the International Centre for Settlement of Investment Disputes.  *Id.* ¶ 11.

31.     On May 22, 2014, the Tribunal issued Procedural Order No. 1, in which the Tribunal decided *inter alia* to bifurcate the proceedings into a first phase, to address jurisdiction and liability, and a second phase to address the amount of compensation owed to the Petitioner in the event that the Tribunal found in the first phase that it had jurisdiction and that India had breached its obligations under the Treaty.  *Id.* ¶ 105.

32.     On June 3, 2014, the Parties agreed, in the Terms of Appointment, that the seat of the Arbitration was in Geneva, Switzerland.  *Id*. ¶ 107.

33.     From April 6 to April 11, 2016, the Tribunal held a hearing on jurisdiction and liability at the ICC Hearing Centre in Paris.  *Id*. ¶ 29.

34.     On December 13, 2017, the Tribunal issued the Interim Award, a 144-page, 424 paragraph decision, in which it unanimously affirmed its jurisdiction and found India liable under the Treaty.  *Id*. ¶ 424.  The Tribunal held that India breached its obligations to accord fair and equitable treatment in Article 3(2) of the Germany-India BIT, by acting in "willful disregard of due process of law" through conduct "which shocks, or at least surprises, a sense of juridical propriety."  *Id*. ¶ 389, *citing Elettronica Sicula S.p.A. (ELSI) (U.S. v. Italy)*, 1989 I.C.J. Rep. 15, ¶ 128 (Judgment of July 20).  In particular, the Tribunal found that India's decision to annul the Devas-Antrix Agreement was "arbitrary and unjustified inasmuch as it was manifestly not based on facts, but on conclusory allegations, and was the product of a flawed process," because no evidence demonstrated the existence of the strategic and societal needs of the state, which India allegedly examined in deciding in favor of the annulment.  Boykin Decl. Ex. 3, Interim Award, ¶¶ 363-374.  The Tribunal also found that, even if such needs had existed, India still would have been liable for failing to act in a transparent manner, because it did not engage with Devas and Petitioner to find a solution acceptable for both sides but instead concealed the fact that it was planning to cancel the agreement.  *Id*. ¶¶ 375-388.

35.     On January 29, 2018, India applied to set-aside the Interim Award before the Swiss Federal Supreme Court.  Boykin Decl. Ex. 4, Swiss Court Decision, at 5.[2]  The Swiss court denied the application on December 11, 2018.  *Id*. at 40.

36.     From April 29 to May 3, 2019, the Tribunal held a hearing on quantum of damages and, on May 27, 2020, issued its unanimous, 125-page, 357-paragraph Award.  Boykin Decl., Award, ¶¶ 33, 357.  The Tribunal calculated damages based on DT's sunk costs for its investment in Devas, and ordered India to pay USD 93.3 million in damages to DT, with pre-award interest from February 17, 2011 (the valuation date), as well as arbitration costs and legal fees, with post-award interest.  *Id*. ¶¶ 283-300.

37.     In addition, the Tribunal accepted Petitioner's undertaking to avoid double recovery in relation to the ICC Arbitration between Devas and Antrix.  In particular, if Antrix ever pays any of the damages it owes to Devas pursuant to the ICC Arbitration Award, DT "will take appropriate steps to ensure that it is not compensated twice."  *Id*. ¶¶ 329, 357(e).

38.     Since the issuance of the Award, Devas has begun the process of being involuntarily wound up by the Indian government and there is no chance of any of its shareholders ever recovering any amount from the award in the ICC arbitration.  Petitioner's only avenue for recovering the losses sustained from India's misconduct is through enforcement of the Award.  To date, Petitioner has been unable to collect on the Award from India.

---

[2]     References to the Swiss Court Decision are to the translation attached thereto.

### III.   Pending Petition to Confirm the Award and Anticipated Judgment Against India

39.    On April 19, 2021, Petitioner brought a Petition to recognize and confirm the Award against India in the United States District Court for the District of Columbia.[3] *DT v. India*, No. 1:21-cv-01070 (D.D.C.).  In that action, Petitioner seeks entry of:  (i) an order recognizing and confirming the Award; and (ii) a money judgment against India in an amount equal to the full amount of damages and interest under the Award, as well as post-judgment interest, attorney's fees, and costs.  *Id.* ECF No. 1, at 34.  In response, on September 23, 2021, India filed a motion to dismiss for lack of subject matter jurisdiction, alleging that there was no agreement to arbitrate, which is a predicate to finding that India waived sovereign immunity under the FSIA.  *Id.* ECF No. 11, at 1.  India argues that there was no agreement to arbitrate because the Treaty does not cover indirectly held investments and did not apply to pre-investment activities.  *Id.*  Both the arbitral Tribunal and the Swiss Federal Supreme Court have already rejected precisely the same arguments.  Boykin Decl. Ex. 3, Interim Award, ¶¶ 141-48; Boykin Decl. Ex. 4, Swiss Court Decision, ¶ 3.2.1.2.5 (p. 8).  India also argues – contrary to the terms of the FAA and the New York Convention – that the Award can only be enforced in India under the terms of the Germany-India BIT.  *See* 9 U.S.C. § 207 ("[A]ny party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration."); New York Convention, Art. III ("Each Contracting State shall recognize arbitral

---

[3]    Petitioner proceeds against Air India before this Court because, under the FSIA, civil actions against "agencies or instrumentalities" may be brought in any judicial district in which "a substantial part of property that is the subject of the action is situated," 28 U.S.C. § 1391(f)(1), or "in which the agency or instrumentality is licensed to do business or is doing business," 28 U.S.C. S 1391(f)(3).  Air India's United States operations are headquartered in this District at 570 Lexington Avenue, New York, New York.  Accordingly, Petitioner must bring its enforcement action against Air India before this Court.  In contrast, the FSIA requires civil actions against a foreign state or its political subdivision, here India, to be brought "in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof," regardless of any connections to that judicial district.  28 U.S.C. § 1391(f)(4).

awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon").  Briefing on the motion to dismiss is currently on-going and will be complete by mid-November.[4]

40.     Petitioner has also initiated proceedings in other locations around the world seeking recognition and enforcement of the Award.  India continues to refuse to pay the amounts due.

## IV.    Cairn and the Mauritius Investors Commence Enforcement Actions Against Air India

41.     Petitioner is not alone in its attempts to recover an unpaid international arbitration award against India by seeking enforcement against Air India.

42.     On May 14, 2021, Cairn Energy PLC and Cairn UK Holdings Limited, both UK entities (collectively "Cairn"), filed a complaint against Air India in this Court, seeking declaratory relief and a money judgment. *Cairn Energy PLC v. Air India, Ltd.*, No. 1:21-cv-04375 (S.D.N.Y. May 14, 2021), ECF No. 1 ("*Cairn* Complaint").  According to the complaint, Cairn made a series of oil and gas exploration investments in India over several decades.  *Id.* ¶ 15.  After the investment, Cairn and India became embroiled in a tax dispute, which resulted in an arbitration under the UK-India Bilateral Investment Treaty.  Cairn was awarded damages of $1.2 billion plus interest.  *Id.* ¶ 26.  Cairn is currently seeking to have this arbitral award confirmed in another federal district court.  *See Cairn Energy PLC et al. v. Republic of India*, 1:21-cv-00396-RJL (D.D.C. Feb. 12, 2020).  Both the enforcement action and the action against Air India are currently pending.[5]

---

[4]     DT filed its opposition to the motion to dismiss on October 15, 2021 and India will file its reply on November 12, 2021.

[5]     In the enforcement action, India has filed a motion to stay the proceedings pending the resolution of an action in the Netherlands to annul the award as well as a motion to dismiss for lack of subject matter jurisdiction.  *Cairn Energy PLC et al. v. Republic of India*, 1:21-cv-00396-RJL (D.D.C.), ECF No. 15 (Motion to Stay (Aug. 13, 2021)) and ECF No. 16 (Motion to Dismiss for Lack of Jurisdiction (Aug. 13, 2021)).  Briefing on both motions

43.     Similarly, on June 18, 2021, the Mauritius Investors filed a complaint against Air India before this Court, seeking declaratory relief and a money judgment.  *CC/Devas (Mauritius) Ltd v. Air India, Ltd.*, No. 1:21-cv-05601-PGG (S.D.N.Y. June 28, 2021), ECF No. 1 ("*CC/Devas* Complaint").  The action is currently pending before this Court.

44.     The claimants in both *Cairn* and *CC/Devas* allege that Air India is the alter ego of the Republic of India and that, as a result, the arbitral awards against India can be enforced against Air India.

45.     Pursuant to Federal Rule of Civil Procedure 10(c), Petitioner adopts by reference the allegations made in the *Cairn*[6] and *CC/Devas*[7] Complaints regarding the relationship between Air India and the Republic of India, and further adopts by reference the documents submitted as exhibits to those Complaints.[8]

46.     The underlying facts in the *Cairn* and *CC/Devas* Complaints are similar to the case at hand with one significant exception:  the Award at issue in this case has been confirmed at the seat of arbitration and is not subject to any further judicial review.  The Swiss Federal Supreme Court reviewed *de novo* the portions of the arbitral Tribunal's Interim Award in which the arbitral Tribunal affirmed its jurisdiction under Article 9 of the Treaty.  Boykin Decl. Ex. 4, Swiss Court Decision, ¶ 3.2.2.2 (p. 20).  The Swiss Court Decision spanned 59 single-spaced pages.  For each

---

is set to complete in mid-March 2022.  *Id.* (Minute Order (Oct. 25, 2021)).  In the action against Air India before this Court, the parties have jointly requested a stay through December 31, 2021.  *Cairn Energy PCL v. Air India, Ltd.*, No. 1:21-cv-004375-PGG (S.D.N.Y.), ECF No. 27 (Joint Letter Motion to Stay (Oct. 27, 2021)).

[6]     *Cairn* Complaint, No. 1:21-cv-04375, ECF No. 1 (May 14, 2021).

[7]     *CC/Devas Complaint*, No. 1:21-cv-05601-PGG, ECF No. 1 (June 28, 2021).

[8]     Citations in the form of "*Cairn* ECF No. __" and "*CC/Devas* ECF No.__" refer to the docket numbers in the *Cairn* and *CC/Devas* proceedings.

of India's arguments, the Swiss Court surveyed the relevant international law authorities and case-law, and distinguished those on which India relied. *See, e.g.*, *id.* ¶¶ 3.2.1.2.4 (pp. 16-18), 3.2.2.2.2 (p. 23), 3.2.3.3.3 (p. 30). Ultimately, the Swiss Federal Supreme Court agreed with the arbitral Tribunal, rejected all of India's challenges to jurisdiction, and affirmed the Tribunal's jurisdiction.[9]

47.   After the arbitral Tribunal issued its Award, India had the right to seek judicial review of the Award before the Swiss Federal Supreme Court. India chose not to exercise its right and the time to do so has elapsed. In contrast, proceedings to set aside both the *Cairn*[10] and CC/*Devas*[11] awards are currently pending in the Netherlands.

## V.   Air India is an Alter-Ego of India

48.   In this action, Petitioner seeks to enforce the Award against Air India as the alter ego of India.

49.   As the Supreme Court held in *Bancec*, an instrumentality of a sovereign can be held liable for actions of the sovereign either when the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created," or when giving effect to the ostensible   separate legal status of the state and its instrumentality would work a "fraud or injustice." 462 U.S. at 629 (internal citations omitted).

_____

[9]   At the public oral deliberations, two of the justices (Justice Kathrin Klett and Justice Martha Niquille) expressed their opinion that the Treaty protected only direct investments. Their disagreement on this point with the other three justices (Justice, Fabienne Hohl, Justice Marie-Chantal May Canellas, and Justice Christina Kiss) does not form a part of the Swiss Court's ultimate reasoned decision, because Swiss law does not recognize dissenting opinions. *See DT v. India*, 21-cv-01070 (D.D.C.), ECF No. 1-3; *Boykin* Decl. ¶ 13.

[10]   *Cairn* Complaint, ECF No. 1, ¶ 27 n. 7 ("India has filed a writ in the Netherlands seeking the annulment of the Award. This proceeding remains pending.").

[11]   *CC/Devas* Complaint, ECF No. 1, ¶ 26 ("India's appeal to the Dutch Supreme Court [seeking to set-aside the merit award] is currently pending.").

50.     Determining whether an instrumentality is "extensively controlled" is "fact-intensive" and "courts have articulated several indicia to guide the inquiry." *EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78, 91 (2nd Cir. 2015). The Second Circuit has noted the following factors that have been deemed relevant: "(1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *Id*.

51.     In addition, courts in this district consider: "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." *Esso Exploration and Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F.Supp.3d 323, 334-35 (S.D.N.Y. 2019) (citing *In re 650 Fifth Ave. & Related Props*., 881 F.Supp.2d 533, 549-50 (S.D.N.Y. 2012)).

52.     "No one factor is dispositive, and the underlying facts should be weighed collectively." *Id*. at 335. Ultimately, courts must determine "whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." *EM Ltd.*, 800 F.3d at 91.

53.     As described in greater detail below, India dominates Air India's activities to such an extent that its relationship is clearly one of principal agent. The facts presented below more than satisfy the standard established in *Bancec*. In particular:

a)      From its nationalization after WWII, Air India has been treated as an alter ego of India and not as a separate company with independent personality.

b)      India deprives Air India of independence from close political control through its economic ownership and Air India's Articles of Association.  Under Air India's Articles of Association, India has the authority to appoint the Chairman and Directors of Air India's Board of Directors and set their remuneration.  India may also issue directives to the company and government approval is also required for certain aspects of Air India's daily operations.

c)      India maintains its control by ensuring that Air India's leadership is comprised of government officials and persons who have strong links with the government.  As a result, Air India's Board is lacking in experience in the airline industry and regularly makes decisions based on political interests, often to the financial detriment of Air India.

d)      India dictates Air India policy and manages it on a day-to-day basis.  Indian law grants India the power to actively supervise numerous aspects of Air India's operations, including budgets, employee matters, matters relating to fares, passengers' complaints, and aircraft acquisition.  India also exercises its control through regular audits of Air India's operations.  India exercises its control to subordinate Air India's operations to its own political interests, placing Air India in a precarious financial position.

e)      India exerts a high level of economic control over Air India and ignores ordinary corporate formalities.  India supports Air India financially through grants, capital contributions, guarantees, loans, and special tax treatments.  In addition, India

controls all aspects of Air India's financial affairs, including (1) Air India's access to other sources of funding, (2) Air India's earnings from air-service operations, and (3) Air India's spending.

f)        India treats the property of Air India as its own.  India regularly uses Air India's services – for which it does not pay – and assumes Air India's debts directly, transferring that debt as it pleases.

g)        India's own courts, in interpreting the Indian Constitution, have held that Air India is one and the same with the State.

**A. Air India Was Created as an Alter Ego of India.**

54.      From the time of its nationalization to the present day, India has always treated Air India as an integral part of the state itself, not a separate company with independent personality. India has full functional, administrative, and economic control over Air India through its Ministry of Civil Aviation ("MoCA").

55.      In 1948, India acquired 49% of Air India's shares from the Tata Group, which had established Air India in the 1930s. The Air Corporations Act of 1953 (the "1953 Act") nationalized the private airlines and established two statutory corporations in their place: Air India International (which flew to international destinations from India) and Indian Airlines (for domestic travel).[12] The 1953 Act made Air India the sole Indian carrier permitted to operate on virtually all international routes, and gave Indian Airlines a monopoly over all domestic flights.  It transferred all existing airline routes in India to these corporations, made employees of preexisting airlines

---

[12]      *See Cairn* ECF No. 1-2, §§ 3(1), 16 (excerpts of The Air Corporations Act of 1953).

employees of Air India International and Indian Airlines, and made it illegal for any other airline company incorporated in India to operate in India without the permission of India.[13]

56.     Under the 1953 Act, India had authority to appoint the Chairman and Directors of the Board of each airline, which in turn is vested with the "general superintendence, direction and management of the affairs and business" of the airline.[14]   India also has the power to direct the hiring of certain employees for both companies.[15]   In addition, the 1953 Act gave the government the power to give any binding directions to the corporation, including but not limited to directing the corporation to implement airline routes and discontinue others, and to exercise veto power over any corporate action.[16]   Government approval was required to appoint the Managing Director, borrow money, make capital expenditures, dispose of property, or enter into a long-term lease.[17] India could also transfer airline routes and property between Air India  and Indian Airlines.[18]

57.     The Air Corporations (Transfer of Undertakings and Repeal) Act of 1994 (the "1994 Act") repealed the 1953 Act and allowed private airlines to compete against both Air India and Indian Airlines.[19]   The Act did not, however, lessen India's control over Air India's day-to-day operations, providing India with the authority to give binding "directions as to the exercise

---

[13]   *See id.* §§ 16–19.

[14]   *See id.* §§ 4(1), 4(1A).

[15]   *See id*. §§ 4(1)(A), 20(2).

[16]   *See id.* § 34.

[17]   *See id.* §§ 8, 10, 35.

[18]   *See id.* § 39.

[19]   *See Cairn* ECF No. 1-3 § 11 (The Air Corporations Act of 1994).

and performance by that company of its functions."[20]  The 1994 Act also reconstituted the airlines as joint-stock Government Companies under the Companies Act of 1956,[21] which were still fully owned by India.[22]

58.     Throughout the 1990s, India provided repeated capital contributions to Air India and routinely guaranteed Air India's loans, while failing to collect guarantee fees that a company would normally pay for such services.[23]  As a result, Air India and Indian Airlines were able to operate at net losses throughout the 1990s and 2000s.[24]

59.     In April 2007, India attempted to bail out both companies by merging them to form the National Aviation Company of India Ltd. ("NACIL").[25] – which was renamed "Air India Limited" in 2010.  It is still colloquially known as "Air India."  The merger illustrates the extent of India's control over Air India and all aspects of its business.  In 2010, following an examination into the newly formed NACIL, the Committee on Public Undertakings described the merger as "flawed," and "an ill-conceived and erroneous decision neither arrived at by the two Airlines on

---

[20]     *See id.* § 9.

[21]     The Companies Act of 1956 defined "Government Companies" as "any company in which not less than fifty-one per cent of the paid-up share capital is held by the Central Government" or other Indian governmental entity—to which special provisions applied.  *Cairn* ECF No. 1-4, § 617 (excerpts of The Companies Act of 1956). Similar provisions exist under the current The Companies Act of 2013. *See Cairn* ECF No. 1-5, §§ 394–95 (excerpts of The Companies Act of 2013).

[22]     *See Cairn* ECF No. 1-3 § 3 (The Air Corporations Act of 1994).

[23]     A 2006 Parliamentary Commission revealed that the government had not collected guarantee fees from Air India from 1989 to March 2004.  *Cairn* ECF No. 1-6, ¶ 6 (MoCA, Public Accounts Committee, 2006–2007, 14–30: "Non-Recovery of Guarantee Fee from Air India and Indian Airlines" (Aug. 7, 2006)).

[24]     *See Cairn* ECF. No. 1-7, ¶ 3.4 (MoCA, Public Undertakings Committee, 2009–2010, 15–4: "National Aviation Co of India Ltd.—Merged Entity of Erstwhile Air India and Indian Airlines" (Jan. 20, 2010)).

[25]     *Id.* ¶ 1.1.

their own accord nor mutually considered by them to be in their best interests."[26]  The merger was planned by the Indian government through MoCA and approved by the Cabinet.[27]  The merger further solidified India's day-to-day control over Air India.

### B. India Deprives Air India of Independence from Close Political Control Through Its Economic Ownership and Air India's Articles of Association.

60.      India owns 100% of Air India, which it describes as "a symbol of the State."  India can (and does) control essentially everything Air India does.[28]

61.      India maintains the power to appoint all members of Air India's Board of Directors, including the Chairman of the Board, to dictate the length of their terms, to set their remuneration, and to remove them for any reason.[29]  India is also permitted to appoint Air India's Managing Director and determine the Managing Director's remuneration.[30]

62.      Under Air India's Articles of Association, India closely supervises Air India and has the ability to issue directives to the company at any time.[31]  India also requires approval for certain aspects of Air India's daily operations.  For example, India requires government approval of all international routes and MoCA makes "suggestions" for all domestic routes which influence

---

[26]  *Id*. at 111.

[27]  *See Cairn* ECF No. 1-8, at 55 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)); *Cairn* ECF No.1-9, at 39 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[28]  *See Cairn* ECF No. 1-9, at 121 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[29]  *See Cairn* ECF No. 1-10, §§ 97, 106, 115 (Articles of Association of Air India Ltd. (Nov. 8, 2019)).

[30]  *Id*. §§ 130–31.

[31]  *Id*. § 161.

Air India "perhaps to a greater extent than that of its competitors."[32]  Most of Air India's routes (domestic and international) operate at a loss.[33]  As of 2009, only thirteen of its routes (5% of its total routes) were profitable.[34]  By November 2014, only nine of its routes made a profit.[35]  Sunil Arora, former Managing Director of Indian Airlines and a board member of Air India, complained that the MoCA barred Indian Airlines from flying on financially viable routes, which were instead snapped up by their competitors.[36]

63.     It is no secret that India continues to dominate Air India to its detriment.  In 2018, India sought to partially divest Air India, offering 76% of its shares for sale, but received no bids.[37]  As *The Economist* explains, investors stayed away from the bidding process because they suspected that India would use its anticipated remaining 24% ownership interest to "keep meddling after the sale to stop job losses ahead of next spring's general election."[38]

---

[32]   *See Cairn* ECF No. 1-7, ¶¶ 5.1, 5.17 (MoCA, *Public Undertakings Committee, 2009–2010, 15–4: National Aviation Co. of India Ltd. – Merged Entity of Erstwhile Air India and Indian Airlines* (Jan. 20, 2010)).

[33]   *See Cairn* ECF No. 1-9, at xv (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[34]   *See Cairn* ECF No. 1-12, at 4 (*The Time For Talking Is Over*, BUSINESSWORLD (Aug. 16, 2009)).

[35]   *See Cairn* ECF No. 1-13, at 5 (Lok Sabha Question 81 (Nov. 25, 2014)).

[36]   *See Cairn* ECF No. 1-14, at 1, 3 (*Praful Patel, Aide Sunk Air India, Former Indian Airlines Chief Says*, TIMES OF INDIA (Aug. 17, 2002)); *Cairn* ECF No. 1-15, at 3 (R. Jagannathan, *The Praful Patel Guide to Destroying AI*, FIRSTPOST (July 1, 2011)); *see also Cairn* ECF No. 1-16 ¶¶ 117–20 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, *One Hundred Fifty First Report On Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector* (Jan. 21, 2010)) (listing international and domestic routes from which Air India withdrew service that were taken up by private sector competitors).

[37]   *See Cairn* ECF No. 1-17, at 2 (Aditi Shah, *Air India Sale Gets No Bid, Exposes Hurdles For Modi's Divestment Drive*, REUTERS (May 31, 2018)).

[38]   *See Cairn* ECF No. 1-18, at 3 (*Plans to Privatise India's Flag-Carrier Have Run Into Turbulence*, THE ECONOMIST (June 9, 2018)).

64.     The Indian government grants certain public sector companies increased financial autonomy in order to allow them to compete in the global market.[39]  These companies are chosen based upon a variety of factors including revenues, profitability, net worth, national and global market presence, stock exchange listing, and loan servicing reliability.[40]  Despite the size and international presence of Air India, it has not been granted this financial and administrative independence.[41]

### C. India Maintains Control by Ensuring that Air India's Leadership is Composed of Government Officials and Persons Who Have Strong Links with the Government.

65.     As mentioned above, India has the power to appoint and replace Air India's Directors, determine their remuneration, appoint the Chairman of the Board, and appoint the Managing Director.

66.     Sunil Arora, a former Air India Board member and Indian Airlines Managing Director, described the Board meetings as "a farce" because "[i]nstructions on key agenda items are communicated beforehand" by MoCA with an expectation of "immediate and unquestioned compliance."[42]

---

[39]     Boykin Decl. Ex. 6 (*Power Ministry recommends Maharatna status to Power Grid*, THE ECONOMIC TIMES (Sept. 21, 2021)).

[40]     Boykin Decl. Ex. 7 (Ratna Status to CPSEs (Dec. 3, 2019)).

[41]     *Id*.

[42]     *See Cairn* ECF No. 1-14, at 2 (*Praful Patel, Aide Sunk Air India, Former Indian Airlines Chief Says*, TIMES OF INDIA (Aug. 17, 2012)) (emphasis added); *see also* Vinod Rai, Not Just An Accountant: The Diary of the Nation's Conscience Keeper (Kindle Locations 3240–42) (stating that the former Comptroller and Auditor General of India has observed that it was commonplace for Air India Board members to receive "telephonic instructions from the minister or his representative on what decision to take" at Board meetings.).

67.     For example, before one Board meeting at which plans to lease property were discussed, the Minister of Civil Aviation informed Mr. Arora that "since he and Secretary, Civil Aviation were satisfied about the correctness of the plans, it is expected that we should immediately endorse it during the Board Meeting."[43]  When Mr. Arora raised concerns, he "was curtly asked to endorse the proposal," because "when the [M]inister and the [S]ecretary . . . are satisfied, what more is there for [the Directors] to see?"[44]

68.     At another Board meeting, MoCA directed the Board to approve a Rs 4 billion expenditure (the current equivalent to about US $54 million)[45] to refurbish airplanes without any cost-benefit analysis done on the proposal.[46]

69.     As a consequence of India's extensive interference in day-to-day operations, Air India has been unable to attract and retain talented officers.  Officers who show independence are punished with restrictions on their authority and are ultimately forced out of Air India.[47]

70.     India also uses its power of appointment to stack the board with civil servants and politicians with no experience in the airline industry, rather than businessmen and women with

---

[43]   *Id*. at 4 (capitalization altered).

[44]   *Id*.

[45]   All Rs-USD calculations use the present exchange rate, unless otherwise noted.

[46]   Rai, *supra* note 42 (Kindle Locations 3277–82) (2014); *see also id*. (Kindle Locations 3240–42) (stating that the former Comptroller and Auditor General of India has observed that it was commonplace for Air India Board members to receive "telephonic instructions from the minister or his representative on what decision to take" at Board meetings.).

[47]   *See e.g.,* Boykin Decl. Ex. 8 (*Air India's COO Capt Gustav Baldauf Resigns*, India Today (Feb. 28, 2011)) (Mr. Baldauf "resigned . . . days after being served a show cause notice over his reported remarks about political interference in the airline's day-to-day affairs."); *Cairn* ECF No. 1-19, at 1 (*Show Cause Notice to AI's COO Baldauf for His Reported Remarks*, Economic Times (Feb. 24, 2011)); *Cairn* ECF No. 1-20 (Manisha Singhal, *Air India Clips COO, CTO's Wings*, Economic Times (Feb. 15, 2011)).

relevant industry knowledge.  As *The Economist* explains, India's inexperienced yet connected Board appointments ensure that Air India's leadership will not act independently to benefit the company, but rather remain "pliant" to political interference to benefit politicians.[48]

71.     A 2010 report by the Parliamentary Committee on Transport, Tourism, and Culture found that India has consistently appointed "generalist" civil servants as Air India's Managing Director, rather than "technocrats and knowledge experts."[49]  That same report found that Air India's Directors were often appointed for short periods of time ("some even for a few days") and lacked any "substantive expertise," and that at the time of the report, there were no "professionals [or] independent Directors on the Board."[50]

72.     Four of the nine present day Directors are current or former politicians and civil servants, four are current Air India officers, and every one of the nine has substantial government ties.[51]

73.     The Chairman of the Board and Managing Director of Air India, Rajiv Bansal, is a senior civil servant and an officer belonging to the Indian Administrative Service, India's principal civil service comprised of career bureaucrats who administer central government ministries,

---

[48]    *See Cairn* ECF No. 1-21, at 5 (*Most of India's State-Owned Firms Are Ripe For Sale Or Closure*, THE ECONOMIST (June 3, 2017)).

[49]    *See Cairn* ECF No. 116, ¶ 162 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, One Hundred Fifty First Report on Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector (Mar. 3, 2010)).

[50]    *Id.* ¶ 157. This is a longstanding problem: a 2003 parliamentary committee report criticized Air India for failing to "professionalize[]" (*i.e.*, appoint "professional managers in industry and trade with a high degree of proven ability") the "Board of Directors for Air India" in accordance with guidelines applicable to public sector enterprises.  *See Cairn* ECF No. 1-22, at 20–21, 23 (Committee on Public Undertaking (2003-2004), Eleventh Report: Air India Limited Reconstitution of Board of Directors (Dec. 17, 2003)).

[51]    *See Cairn* ECF No. 1-23 (Air India, *Board of Directors*).

departments, agencies, and corporations.[52]   Two other Directors, Vimalendra Patwardhan and

Satyendra Kumar Mishra, are also senior civil servants nominated by the MoCA – the Indian

department responsible for supervising and regulating the airline industry, including Air India.[53]

Daggubati Purandeswari, an "independent Director," is a former member of Parliament.[54]   Vinod

Hejmadi is Air India's present Chief Financial Officer, Amrita Sharan is Air India's Director of

Personnel, Meenakshi Mallik is Director of Commercial, and R.S. Sandhu is Director of

Operations.[55]

74.     The other ostensibly "independent Director" is Kumar Mangalam Birla, the

chairman of the Aditya Birla Group, who has been nominated by India to the Board of Directors

of other government-managed or -controlled institutions and has led several government task

forces in the past.[56]   In 2001, the Committee on Public Undertakings observed that "there are no

Functional Directors and also Non-official Directors in the Board of Directors of Air India for the

last two years" and the "Managing Director is the only person who is professionally conversant

with the airline business in the current Board of Directors."[57]

---

[52]   *See Cairn* ECF No. 1-24, at 2-3 (*Rajiv Bansal is Air India's Next Chairman and Managing Director*, HINDUSTAN TIMES (Sept. 15, 2020)). In April 2020, India's cabinet of ministers upgraded Mr. Bansal to a rank equivalent to a secretary to the government (the senior-most position available to officers working for the government).  *Cairn* ECF No. 1-25, at 1-2 (*Government Promotes Air India Chief Rajiv Bansal To Secretary-Level Rank*, FINANCIAL EXPRESS (Apr. 26, 2020)).

[53]   *See Cairn* ECF No. 1-26, at 3 (*Air India May Send 5000 Employees on Compulsory Leave*, INDJOURNALS (July 16, 2020)).

[54]   *See id*. at 2-3.

[55]   *See Cairn* ECF No. 1-23 (Air India, *Board of Directors*).

[56]   *See Cairn* ECF No. 127, at 3-4 (Aditya Birla Group, *Mr. Kumar Mangalam Birla*,).

[57]   *See* Boykin Decl. Ex. 9, ¶ 8.1 (Fourth Report: Committee on Public Undertakings (2000–2001): Air India Limited, Ministry of Civil Aviation (Feb. 2001)) (observing that Air India's "Managing Director is the only

75.     India also preserves its control with high turnover among its officers.  According to a Parliamentary Report, this turnover "has resulted in the impairment of the entire decision making process."[58]

76.     Even government officials have recognized that, in reality, Air India is not yet a "board managed company."[59]

### D.  India Dictates Air India Policy and Manages Its Day-to-Day Operations.

#### 1.  Indian Law Grants India the Power to Actively Supervise Air India's Operations.

77.     India's Constitution provides for the formulation of Business Allocation Rules to divide the power amongst the ministries and departments of the government.[60]  These Rules place Air India under the direct control of MoCA and provides MoCA with administrative control over the following matters for Air India and its subsidiaries:

i)     General policy and allied matters;

ii)    Constitution of [the] Board of Directors;

iii)   Administrative matters including deputations/delegations/ training; request for posting/transfers/promotion/housing; SC/ST matters etc; verification of characters & antecedents of employees;

iv)    Air India  employees  service  regulations/rules,  and  amendments /interpretations thereof;

---

person who is professionally conversant with the airlines business in the current Board of Directors which consists of four Government Directors and one professional manager").

[58]   *See Cairn* ECF No. 1-16, ¶ 163 (Department-Related Parliamentary Standing Committee on Transport, Tourism and Culture, Merger of Public Accounts Committee, One Hundred Fifty First Report On Merger of Indian Airlines and Air India: Its Impact on the Civil Aviation Sector (Mar. 3, 2010)).

[59]   *See Cairn* ECF No. 1-29, at 3 (Pranay Mukul, *Government Working on New Turnaround Plan for Air India*, INDIAN EXPRESS (Sept. 7, 2018)).

[60]   Article 77(3) of the Constitution of India states, "The President shall make rules for the more convenient transaction of the business of the Government of India, and for the allocation among Ministers of the said business." *Cairn* ECF No.1-30, Art. 77(3) (excerpts of the Indian Constitution).

v)      Financial matters including five years/annual plans, annual reports and [a]ccounts, budgetary support/[f]inancing arrangements for capital expenditure/[g]ovt. [g]uarantees;

vi)     Investments proposals including purchase/ lease purchase/lease of aircraft and equipment; investment of funds abroad; duty exemptions;

vii)    Performance review/monitoring of targets;

viii)   Labour welfare; wage revision; strikes/[i]ndustrial disputes; [g]rievances of employees;

ix)     Matters relating to fares and freight rates/concessional fares;

x)      Grant of free/concessional passages and transportation of cargo;

xi)     Matters relating to air services/carriage of cargo; priority quota of [s]eats;

xii)    CSA/passenger/cargo [s]ervices agents and related matters;

xiii)   Advisory [c]ommittees, passenger facilitation;

xiv)    Passengers' complaints/suggestions;

xv)     Board meetings;

xvi)    VIP references on matters handled in the Section;

xvii)   International operations of Air India except the "designation" and utilization of entitlements/traffic rights' available for Indian carriers;

xviii)  Deputation/delegation of Air India and its subsidiaries officials for participation in conferences/meetings on matters with ICAO and Bilateral air agreements;

xix)    Directions to Air India (on [i]nternational [s]ervices) for grant of free/concessional air passage/air transportation;

xx)     Annual Reports and laying of accounts before Parliament.[61]

---

[61]   *Cairn* ECF No. 1-31, at 6 (MoCA, Functions Allocated to the Ministry and Their Distribution among Sections (June 23, 2014)).

78.     MoCA is also in charge of "[l]egal matters and court cases, audit reports/observations," "Parliament [q]uestions, reports of Parliamentary Committees and other related matters," "[m]eetings of [c]ommittee" and "[d]rafting of legislation" in relation to the subjects listed above in paragraph 77, "[d]isinvestment, allocation of shares, issues of bonds etc[.] of Air India," and "[p]ermission to travel by Private Airline by Government Servants/Officers."[62]

79.     The Government of India (Transaction of Business) Rules, 1961, require that the appointment of the Chairman and the Boards of "State-owned public corporation[s]" like Air India be approved by India's Cabinet of Ministers.[63]  MoCA internal documents allocate oversight responsibility of various aspects of Air India's operations – including disposal of aircraft, wage agreements, and industrial disputes – to MoCA officials.[64]

80.     The Indian Parliament intimately scrutinizes MoCA's management of Air India and Air India's performance.  Much of this examination takes place during the "Question Hour," the first hour of the Parliament's sitting session, which is customarily devoted to questions that Members of Parliament raise about any aspect of administrative activity to specific ministers.[65]  In addition, parliamentary committees "examine [Air India] and hold discussions on its functioning

---

[62]   *Id.* at 7.

[63]   *See Cairn* ECF No. 1-32, at 14 (Government of India (Transaction of Business) Rules, 1961).

[64]   *See Cairn* ECF No. 1-33, at 4 (MoCA, Consolidated Departmental Instructions on the Channel of Submission and Level of Final Disposal of Various Cases (June 1, 2014)).

[65]   *See, e.g., Carin* ECF No. 1-13 (Lok Sabha Questions Compilation) (Question Hour during which members of Parliament ask about Air India's functioning including aircraft acquisition, lease of aircraft, route planning, flight operations, flight incidents, delays, customer service complaints, recruitment, and labor and wage of employees).

and performance" in order to ensure that its "policies and activities of are . . . under constant scrutiny of the public through [this process]."[66]

81.     India also exercises control over the audits of Air India's accounts and performance. Sections 139(5) and 143(5) of the Companies Act of 2013 empower the Comptroller and Auditor General of India to (i) appoint the  auditor of a Government Company (such as Air India) and (ii) to direct such auditor as to the manner in which Air India's accounts are to be audited.[67]  Under the Act, the audit report must be submitted to the Comptroller and Auditor General of India who may conduct a "supplementary audit of the financial statement" of Air India and either comment upon or supplement the audit report.[68]  The audit report, along with any comments or supplement, is provided to Parliament for review.[69]

82.     These audits – directed and supervised by India – examine every aspect of Air India's operations.  For example, in the 2011 Performance Audit Report,[70] India examined and commented on, among other things, aircraft acquisition (pp. 5–35), revenue parameters (pp. 87–88), aircraft leases (p. 91), cargo operations (pp. 92–93), route strategy (pp. 93–98), customer service (pp. 98–99), publicity and sales promotion (pp. 99–101), financial performance (pp. 104–

---

[66]   *Cairn* ECF No. 1-34 (excerpts of Air India's Right to Information Manual).

[67]   *See Cairn* ECF No, 1-5 § 143(5)-(6) (excerpts of Companies Act of 2013); *see also Cairn* ECF No. 1-35 § 57 (Comptroller and Auditor General Regulations on Audit and Accounts (Amendments) 2020).

[68]   *Cairn* ECF No, 1-5 § 143(6) (excerpts of Companies Act of 2013)

[69]   *Id* § 394(1)(b).

[70]   *Cairn* ECF No. 1-9 (Comptroller and Auditor General, Performance Audit Report (Sept. 11, 2011)).

109), and Air India's revenue management system (p. 110).  The 2017 Performance Audit Report was similarly detailed. [71]

### 2. *India Subordinates Air India's Operations to Its Political Interests.*

83.　　India often subordinates Air India's business interests to India's foreign policy objectives, government officials' corrupt personal interests, and bizarre pet projects.

84.　　In 2002, for example, India's foreign minister flew to Afghanistan and presented the Afghan government with the plane he flew on – an Air India aircraft – as a gift. [72]  India proceeded to transfer two additional Air India aircraft to Afghanistan's national airline as part of the Afghan government's initiative to rebuild its aviation infrastructure. [73]

85.　　In 2013, a Canadian court convicted a Canadian-Indian individual for conspiring to bribe the Indian Minister of Civil Aviation to use his official position to force Air India to award a US $100 million contract to a biometric security company. [74]  Although the bribery scheme ultimately failed, the conspiracy illustrates the extent of the MoCA's real and perceived control over Air India's business decisions.

86.　　MoCA has also attempted to micro-manage Air India's services by demanding, in June 2002, that Air India offer executive class passengers ayurvedic massages during flights, an idea with myriad technical flaws (including the fact that massage oil is combustible and not

---

[71]　*See generally Cairn* ECF No. 1-36 (Comptroller and Auditor General, *Performance Audit Report* (Mar. 10, 2017)).

[72]　See *Cairn* ECF No. 1-38 (*Indian Official Comes Bearing Gift For Afghan Airline*, L.A. TIMES (Aug. 11, 2002)); *Cairn* ECF No.1-37 (*India Gifts 3 Airbus Aircraft To Afghanistan*, REDIFF.COM (May 7, 2002)).

[73]　*Id.*

[74]　*See Cairn* ECF No. 1-39 (*R. v. Karigar*, 2013 ONSC 5199 (Ontario Sup. Ct.)); *Cairn* ECF No. 1-40 (*Canadian accused of bribing cabinet minister in India*, GLOBE AND MAIL (Feb. 1, 2012)).

suitable for aircraft use).[75]  It took four months for Air India to scrap this plan, but only after months spent convincing MoCA that the idea was not viable.[76]

87.     A particularly egregious example of how India has used Air India to further its own political interests is Air India's purchase of 68 aircraft from US-based Boeing Corporation ("Boeing") during 2004–2006—the largest aircraft purchase in India's civil aviation history.[77] While the Boeing purchase made little economic sense for Air India, it was of substantial diplomatic value to India.  In particular, during nuclear cooperation talks between India and the United States, members of the U.S. Congressional Caucus on India and Indian Americans wrote to India's Prime Minister pushing for Air India to purchase aircraft from Boeing.[78]  The letter was forwarded to MoCA, which promptly decided to purchase planes from Boeing.[79]

---

[75]   *Cairn* ECF No. 1-41 (*Ayurvedic Massages on Board A-I*, ECONOMIC TIMES (June 15, 2002)); *Cairn* ECF No. 1-42 (*No Massages For Air-India Passengers*, FINANCIAL EXPRESS (Oct. 21, 2002)).

[76]   *Id.*

[77]   *See Cairn* ECF No. 1-9, at 5–14 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)); *Cairn* ECF No. 1-43 (*Air India Buys 68 Planes From McNerney's Boeing*, FORBES (Jan. 11, 2006)).

[78]   *Cairn* ECF No. 1-8, at 147 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)); *see also Cairn* ECF No.1-44 (*US Seeks Indian Nod for Boeing Deal*, HINDUSTAN TIMES (Oct. 27, 2003)) (Congressman Joseph Crowley "urg[ed] Prime Minister Vajpayee to authorise the sale as soon as possible."); *Cairn* ECF No. 1-45 (*US Congressmen Urge Indian Premier to Authorize Aircraft Sale*, BBC INTERNATIONAL REPORTS SOUTH ASIA (Oct. 25, 2003)) (Congressman Joseph Crowley urged the sale as "it will serve as a 'great demonstration' of 'strengthened' Indo-US commercial ties"); *Cairn* ECF No.1-46, at 45 (India Nuclear Chronology, James Martin Center for Nonproliferation Studies at the Monterey Institute of International Studies (Dec. 1, 2010)) (India confirmed on July 31, 2003 that it "[was] involved in a dialogue with the United States to develop and expand nuclear and space cooperation").

[79]   *See Cairn* ECF No. 1-8, at 120 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

88.     In 2004, MoCA pressured Air India to revise the plan it had previously approved for the purchase of aircraft from a total of 28 planes to a total of 68 planes.[80]

89.     Boeing offered less favorable terms than other bidders,[81] and the Board of Air India told MoCA that it would not be economically feasible to purchase from Boeing.[82]  The acquisition made even less sense, the Indian Parliament's Public Accounts Committee found, because India was planning on merging Air India and Indian Airlines at the time, and Indian Airlines' captains and first officers were licensed to operate only Airbus aircraft, and could not operate Boeing aircraft.[83]

90.     Despite concerns raised by the Board about acquiring excess aircraft, India firmly insisted on the acquisition in the interest of facilitating ongoing negotiations with the United States to lift a ban on selling nuclear technology to India.[84]

91.     Mr. Arora, a Board member at the time, explains that India compelled the Board to approve this purchase.[85]  The Board was not given a Financial Evaluation Report regarding the proposal until "three days after the Board meeting" approving the purchase.[86]

---

[80]   *See id.* at 141-42 (brief chronology of Air India's aircraft acquisition from Boeing); *Cairn* ECF No. 1-9, at 9–12 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[81]   *Cairn* ECF No. 1-8, at 120 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[82]   *Id.* at 120–21.

[83]   *Id.* at 69–70.

[84]   *See Cairn* ECF No. 1-47 (*How to Ruin a Public Sector Institution*, ECONOMIC & POLITICAL WEEKLY (Sept. 17, 2011)).

[85]   Rai, *supra* note 42 (Kindle Locations 3246–52).

[86]   *Id.*

92.     India continued to dominate negotiations with Boeing even after Board approval.[87] The acquisition of 68 aircraft was finalized following approval by three cabinet committees, the Cabinet, the Empowered Group of Ministers, and, lastly, upon direct approval from India's Prime Minister's office on December 30, 2005.[88]

93.     In another example of how India subordinates Air India's interests to its own political motives, in 2004, MoCA started "impress[ing] upon the need for Air India to examine the possibility of non-stop India-US operations."[89]  Air India did open a non-stop India-US route but has consistently lost money on operating these flights.  In fact, an audit from 2014 revealed that Air India's single largest loss-making route was the India-US route.[90]

94.     These decisions, while devastating to Air India commercially, nevertheless advanced and achieved India's political aims.  On March 2, 2006, shortly after finalizing the deal with Boeing, India and the United States signed the Civil Nuclear Cooperation Agreement, the first step in lifting the ban on selling nuclear technology to India. [91]  President Bush commented

---

[87]  *Id.* at 30 ("In view of cumulative factors mentioned above the [Empowered Group of Ministers ('EGoM')] chose to place firm orders of 50 aircraft on account of discounts made available by Boeing Company as also the other investments to be made by the Boeing Company in India."); *See Cairn* ECF No. 1-9, at 33 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)) ("The commitments obtained from Boeing in respect of the AIL aircraft acquisition, as reflected in Chairman, EGoM's note to the PM, were … : [i] Boeing would provide training simulators costing up to US $75 million. [ii] Boeing would invest up to US$ 100 million for creation of MRO [Maintenance, Repair and Overhaul] facilities for Boeing aircraft in India. [iii] Boeing would invest US$ 10 million in training and other civil aviation requirements.").

[88]  *See Cairn* ECF No. 1-8, at 141-42 (brief chronology of Air India's aircraft acquisition from Boeing).

[89]  *See, e.g.*, *Cairn* ECF No. 1-9, at 10 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[90]  *Cairn* ECF No. 1-8, at 93, 135 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[91]  *See, e.g.*, *Cairn* ECF No. 1-48 (*U.S. Announces Nuclear Exception for India*, N.Y. TIMES (July 27, 2007)).

when signing the Agreement that "[m]iddle class Indians are buying home appliances from American companies like Whirlpool.  Younger Indians are enjoying McCurry meals from McDonald's.  *And Air India has recently ordered 68 planes from Boeing*."[92]

95.     Air India was ultimately forced to sell many of these unnecessary Boeing planes to a competitor at a steep loss for just a third of their listing price.[93]

96.     In 2012, an Indian court, in an action challenging Air India's purchase of aircraft, also questioned Air India's "giving away … profitable air routes to the private airlines and retaining only loss making routes and even the unprofessional decision of merger of Indian Airlines and Air India."[94]

97.     Reviewing these events retrospectively, a 2014 Parliamentary committee report faulted the government for "impinging on the autonomy of [Air India] leading to loss of traffic to [Air India]," noting that the government pressured Air India into offering the India-US routes "in[] spite of the fact that historically, India-USA sector was a loss-making sector and a commercially unviable route."[95]

---

[92]   *Cairn* ECF No. 1-49 (*Bush to Nation: India-US N-deal Good*, INDO-ASIAN NEWS SERVICE (Mar. 6, 2006)) (emphasis added).

[93]   *See Cairn* ECF No. 1-50 (*Gajapathi Slams UPA for Air India Losses*, INDIA TODAY (Oct. 2, 2014)).

[94]   *See Cairn* ECF No. 1-51, at 23–24 (*Ctr. for Pub. Interest Litigation v. Union of India* (2012) 3 SCC).

[95]   *Cairn* ECF No. 1-8, at 136 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

98.     In 2017, India's investigating agency, the Central Bureau of Investigation, launched a probe into, among other things, Air India's irregular purchase of a large number of aircraft and route planning strategy under MoCA's directive.[96]

### 3.   India Runs Air India's Operations on a Day-to-Day Basis.

99.     There is no doubt that India's extensive control encroaches into even the most trivial aspects of Air India's day-to-day operations.   MoCA evaluates and negotiates terms for transactions involving aircraft acquisition,[97] aircraft insurance,[98] lease of aircraft,[99] and aircraft grounding.[100]  When Air India sought admission to the Star Alliance, a global airline alliance, the Star Alliance demanded concessions from the government of India, concessions unrelated to Air India that only the government could provide.[101]  India interferes with Air India's route planning strategy as a matter of course with little concern for Air India's profits or financial health.[102]  India

---

[96]   *See Cairn* ECF No. 1-52 (*CBI Files Three FIRs on UPA Aircraft Buy*, Air India decisions, TIMES OF INDIA (May 30, 2017)); *Cairn* ECF No. 1-53 (*Air India Investigation: A Reckoning Six Years in the Making*, THE WIRE (June 7, 2017)); *Cairn* ECF No. 1-13, at 35–36 (Lok Sabha Question 3004 (Aug. 3, 2017)) (FIRs registered by CBI relating to abuse of official position in the purchase of the 68 Boeing aircraft and other conducts).

[97]   *See, e.g.*, *Cairn* ECF No. 1-9, at 5–35 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[98]   *See, e.g.*, *Cairn* ECF No. 1-13, at 33–34 (Lok Sabha Question 886 (July 20, 2017)) (the MoCA reporting to the Parliament insurance premium paid by Air India for grounded aircraft).

[99]   *See, e.g.*, *id.* at 31–32 (Lok Sabha Question 3584 (Mar. 23, 2017)) (the MoCA reporting to the Parliament aircraft lease terms); *id.* at 28 (Lok Sabha Question 4692 (Dec. 15, 2016)) (the MoCA reporting to the Parliament lease of aircraft for regional operations).

[100]  *See, e.g., id.* at 7 (Lok Sabha Question 1103 (Mar. 2, 2015)) (the MoCA reporting to the Parliament the number of grounded aircraft and reasons for grounding).

[101]  *See Cairn* ECF No. 1-8, at 71 (MoCA, Public Accounts Committee, 2013–2014, 15–93: "Performance of Civil Aviation in India" (Feb. 6, 2014)).

[102]  *See, e.g.*, *Cairn* ECF No. 1-9, at 10 (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)) (describing how India pressured Air India to open up a US-India direct route).

even handles Air India's customer complaints – many of which go unaddressed because Air India depends on the government, not customer satisfaction, for its survival.[103]

100.     The MoCA also routinely reports to Parliament on issues related to Air India's daily operations, such as operational delays and  emergency landings.[104]  Supervision of Air India's daily operation extensively reaches matters such as tackling technical issues of aircraft,[105] Air India's business dealings with vendors and travel agencies,[106] and even taking steps to "keep rats away from flights and its surrounding places."[107]

101.     MoCA negotiates with representatives of pilots and directly regulates pay, employee benefits, and their working schedule.[108]  MoCA appointed a Committee headed by a former Indian Supreme Court justice to review various issues related to pay and wage

---

[103]   *See Cairn* ECF No. 1-33, at 4 (MoCA, Consolidated Departmental Instructions on the Channel of Submission and Level of Final Disposal of Various Cases); *Carin* ECF No. 1-13, at 21-22 (Lok Sabha Question 3179 (Dec. 17, 2015)) (the MoCA reporting to the Parliament Air India's complaint handling procedure).

[104]   *See*, e.g., *Cairn* ECF No. 1-13, at 27 (Lok Sabha Question 707 (July 21, 2016)) (flight delay due to fight between flight attendants); *id.* at 12 (Lok Sabha Question 1864 (Mar. 9, 2015)) (a tail strike and hard landing incident); *id*. at 9 (Lok Sabha Question 1106 (Mar. 2, 2015)) (emergency landing due to engine problems with the Boeing 787 Dreamliners).

[105]   *See, e.g., id.* at 24 (Lok Sabha Question 838 (Apr, 28, 2016)) (technical glitches with the Boeing 787 Dreamliners and maintenance process); *id*. at 44 (Lok Sabha Question 2751 (Aug. 20, 2018)) (investigating into software glitch in the airline's check-in system).

[106]   *See, e.g., id.* at 45 (Lok Sabha Question 1778 (Dec. 20, 2018)) (potential conflict of interest arising from the distribution deal with Air India's ticket agency); *id.* at 29 (Lok Sabha Question 43 (Feb. 2, 2017)) (alliance with Indian Railway Catering and Tourism Corporation Limited).

[107]   *Id.* at 34 (Lok Sabha Question 817 (Apr. 28, 2016)).

[108]   *See, e.g., id.* at 39 (Lok Sabha Question 935 (Feb. 8, 2018)) (government meeting with pilot representatives to negotiate pays and allowances); *id.* at 10-11 (Lok Sabha Question 1136 (Mar. 2, 2015)) (pilot recruitment and pilot working hour rules); *id.* at 16-17 (Lok Sabha 472 (Apr. 27, 2015)) (stressed pilots); *id.* at 6 (Lok Sabha Question 1362 (Dec. 1, 2014)) (payment of house rent allowance to Air India employees); *id.* at 14-15 (Lok Sabha Question 3077 (Mar. 16, 2015)) (working schedule for technical staff of the merged entity of Air India and Indian Airlines Limited).

rationalization between employees of the two airlines following the 2007 Air India-Indian Airlines merger.[109] The Minister of Civil Aviation described these employee matters as being "between me and my children [*i.e.*, Air India's employees]."[110]

102.    In order to keep the airline afloat, India approved a Turn Around Plan and a Financial Restructuring Plan ("TAP/FRP") in April 2012.[111] The TAP/FRP made it easier for India to interfere with Air India's business operations by creating an Oversight Committee empowered to monitor Air India's progress in achieving the Turn Around Plan's objectives.[112] The Oversight Committee – which is headed by the Secretary of the MoCA and consists of other governmental officials – regularly reviews Air India's performance.[113] India separately audited Air India's achievements under the TAP/FRP in 2016.[114]

103.    Air India has been an essential instrument of India's effort to combat the COVID-19 pandemic. India designated Air India as a "nodal agency" and ordered it and its subsidiaries to operate non-scheduled flights to evacuate stranded Indian citizens throughout the world under the supervision of multiple government agencies.[115] As of September 21, 2021, Air India has operated

---

[109]   *Cairn* ECF No. 1-36, at 93 (Comptroller and Auditor General, *Performance Audit Report* (Mar. 10, 2017)).

[110]   *Cairn* ECF No. 1-54 (*The Air India Fiasco*, WALL STREET J. (Mar. 15, 2011)).

[111]   *Cairn* ECF No. 1-13, at 2-3 (Lok Sabha Question 7 (Nov. 24, 2014)) (the MoCA reporting to the Parliament about setting up an Oversight Committee to monitor Air India's progress under the TAP/FRP); *Cairn* ECF No. 1-36, at 145 (Comptroller and Auditor General, Performance Audit Report (Mar. 10, 2017)).

[112]   *Cairn* ECF No. 1-13, at 52 (Lok Sabha Question 2882 (Dec. 5, 2019)).

[113]   *See also id.*, at 13 (Lok Sabha Question 3051 (Mar. 16, 2015)).

[114]   *See Cairn* ECF No. 1-36, at i (Comptroller and Auditor General, *Performance Audit Report* (Mar. 10, 2017)).

[115]   *See Cairn* ECF No. 1-55 (*Vande Bharat Mission: Major Airports and Ports in India Gear Up to Receive Stranded Indians Abroad*, ECONOMIC TIMES (May 7, 2020)); *Cairn* ECF No.1-56, at 161-62 (excerpts of 2019–

a total of 34,384 repatriation flights to evacuate 4,388,521 stranded passengers.[116]  Air India is currently scheduled to continue operating repatriation flights under phase 13 of the Vande Bharat Mission.[117]  Air India also operated special charter flights to transport essential medical and supplies "on the directions of the Government."[118]

104.     MoCA has also actively supervised and controlled Air India's financial response to the pandemic.  In particular, since July 2020, MoCA has been meeting with Air India's officials to review staff cost and adjust pay and allowances in light of the pandemic, ultimately deciding to impose compulsory leave without pay for up to five years.[119]  Vehement protests against MoCA for its  treatment of Air India's employees led MoCA (not Air India) to withdraw the leave without pay policy.[120]

### E.  By Exerting Economic Control Over Air India, India Ignores Ordinary Corporate Formalities.

105.     India enjoys control over all aspects of Air India's financial affairs.  Air India's revenues come "from its internal accruals, bank borrowing and financial support from the

---

2020 Air India Annual Report); *Cairn* ECF No.1-57 (MoCA Departmental Order (May 6, 2020)) (designating Air India as the "nodal agency" to facilitate the government's repatriation process).

[116]     Boykin Decl. Ex. 10 (Vande Bharat Mission - Number of Flight and Passengers Flown (Sept. 21, 2021)).

[117]     Boykin Decl. Ex. 11 (Vande Bharat Mission – Evacuation Schedule Phase 13 (Sept. 9, 2021)).

[118]     *Cairn* ECF No. 1-56, at 161–62 (excerpts of 2019–2020 Air India Annual Report).

[119]     *Cairn* ECF No. 1-60 (*Pay Cut: Air India Pilots Warn of "Potentially Disastrous Psychological Impact"*, TIMES OF INDIA (July 23, 2020)) (Air India tweeted that "[r]ecent decisions … regarding rationalization of staff cost were reviewed in a meeting at @MoCA_goi"); see also *Cairn* ECF No. 1-61 (Opposition MPs Ask Puri to Withdraw AI's Leave without Pay Scheme, SOCIAL NEWS (July 16, 2020)).

[120]     *See Cairn* ECF No. 1-61 (Opposition MPs Ask Puri to Withdraw AI's Leave without Pay Scheme, SOCIAL NEWS (July 16, 2020)); *Cairn* ECF No. 1-62 (Pilot Unions Urge Air India, Ministry to Reverse Salary Cuts, THE HINDU (Mar. 28, 2021)).

Government of India."[121]   Air India has lost money every year since and thus relies on the government for its survival.  Air India's management has candidly acknowledged that it can sustain its business only with "continued  support of the Government"[122] and, according to one former Managing Director, "[i]f Air India had been private, it would have closed down long ago."[123]  As detailed below, India exerts controls over Air India's access to funding by:  (1) providing significant financial support to Air India;  (2) controlling Air India's access to other sources of funding; and (3) controlling Air India's spending and overseeing its financial situation.

### 1.  *India Provides Significant Financial Support to Air India.*

106.   Air India is so dependent on India's financial support that, without such support, Air India's management says it would be "extremely difficult to maintain . . . current operations,"[124] and its independent auditor has questioned Air India's ability "to continue as a going concern," given the "complete erosion of [its] net worth."[125]  As detailed below, India provides significant and regular financial support to Air India through a combination of capital contributions, grants, and loans.

107.   *First*, financial support is regularly made available to Air India by India through direct capital contribution.[126]   Despite efforts to improve "both operational and financial

---

[121]   *See Cairn* ECF No. 1-13, at 53 (Lok Sabha Question AU772 (Feb. 6, 2020)).

[122]   *See Cairn* ECF No. 1-56, at 58, 82 (excerpts of 2019–2020 Air India Annual Report).

[123]   *See Cairn* ECF No. 1-12 (*The Time for Talking Is Over*, BUSINESSWORLD (Aug. 16, 2009)).

[124]   *See Cairn* ECF No. 1-56 at 10 (excerpts of 2019-2020 Air India Annual Report).

[125]   *Id.* at 81–82.

[126]   *Id.* at 188 ("The Company has regularly received Equity Infusion from the [government of India]. . . . ."); *Cairn* ECF No. 1-63 (*Air India Has Received Rs 30,520-cr Equity Infusion Since FY12*, *Says Govt*, BUSINESS STANDARD, at 1 (Dec. 5, 2019)); *see also Cairn* ECF No. 1-13, at 52 (Lok Sabha Question AU2882 (Dec. 5,

turnaround of [Air India]" through the Turn Around Plan,[127] Air India continues to "rel[y] on Government support to conserve its liquidity position."[128]   As detailed in annual reports, the cumulative total of the government's capital contribution has risen from Rs 1.45 billion (US $36.03 million)[129] in 2007-2008 to Rs 326.65 billion (US $4.41 billion)[130] in 2019-2020.[131]   From 2007-2008 to 2019-2020, India's average annual capital contribution was Rs 25.13 billion (US $342.70 million).   These funds are appropriated in the national budget approved by the Parliament each year.

108.    After the 2012 financial restructuring plan failed, India considered a new Turn Around Plan in 2018, known as the Strategic Revival Plan, to allow Air India to "stand on its own

2019)) ("Air India has received an equity infusion of Rs. 30520.21 crore till date from FY 2011-12 which includes financial support as per TAP/FRP and cash support in FY 2018-19"); *Cairn* ECF No. 1-56, at 81 (excerpts of 2019–2020 Air India Annual Report) ("The Company has received continuous support from the Government of India (GoI) initially through the introduction of the Turnaround Plan (TAP)/Financial Restructuring Plan (FRP) approved in 2012 and then under the Strategic Revival Plan in FY 2018- 19 which has helped the Company to improve its operating and financial parameters.").

[127] *See Cairn* ECF No. 1-64, at 17–18 (excerpts of 2014–2015 Air India Annual Report).

[128] *Cairn* ECF No. 1-56, at 194 (excerpts of 2019–20 Air India Annual Report).

[129] The USD figure is calculated based on the average exchange rate for Rs-USD in 2007–2008

[130] The USD figure is calculated based on the average exchange rate for Rs-USD in 2019–2020.

[131] *See Cairn* ECF No. 1-65, at 101 (excerpts of 2007–2008 Air India Annual Report) (Rs 1.45 billion); *Cairn* ECF No. 1-66, at 89 (excerpts of 2009–2010 Air India Annual Report) (Rs 9.45 billion); *Cairn* ECF No. 1-67, at 63 (excerpts of 2010–2011 Air India Annual Report) (Rs 21.45 billion); *Cairn* ECF No. 1-68, at 76 (excerpts of 2011–2012 Air India Annual Report) (Rs 33.45 billion); *Cairn* ECF No. 1-69, at 95 (excerpts of 2012–2013 Air India Annual Report) (Rs 93.45 billion); *Cairn* ECF No. 1-70, at 93 (excerpts of 2013–2014 Air India Annual Report) (Rs 143.45 billion); *Cairn* ECF No. 1-64, at 117 (excerpts of 2014–2015 Air India Annual Report) (Rs 171.78 billion); *Cairn* ECF No. 1-71, at 124 (excerpts of 2016–2017 Air India Annual Report) (Rs 267.53 billion); *Cairn* ECF No. 1-72, at 142 (excerpts of 2017–2018 Air India Annual Report) (Rs 286.90 billion); *Cairn* ECF No. 1-73, at 157 (excerpts of 2018–2019 Air India Annual Report) (Rs 326.63 billion); *Cairn* ECF No. 1-56, at 141 (excerpts of 2019–2020 Air India Annual Report) (Rs 326.65 billion).

feet" to prepare the airline for an eventual sale to the private sector.[132]  Competing airlines regularly question India's financial support to Air India, accusing  the government of granting Air India "special privileges" and "funding its losses."[133]  Even the Comptroller and Auditor General of India has criticized India for not adjusting its capital contributions in Air India.[134]

109.    **Second**, Air India receives aid in the form of grants from MoCA.  For example, during financial year 2020–2021, MoCA issued a grant of approximately Rs 8.1 billion (US $110.2 million) to Air India for the purchase of  two new aircraft.[135]  These aircraft were to be used to fly the country's top leadership on important government missions and have since been transferred to the Indian Air Force.[136]

110.    **Third**, India allocates substantial sums on a regular, annual basis to Air India Asset Holding Ltd ("AIAH"), a special purpose vehicle ("SPV") incorporated by India in 2018 to offload Air India's debt in order to make Air India a more attractive acquisition target.  For the 2021–2022 fiscal year alone, India, through MoCA, budgeted Rs 22.69 billion (US $308.79 million) for AIAH.[137]

---

[132]    *See Cairn* ECF No. 1 --29, at 3 (Pranay Mukul, *Government Working on New Turnaround Plan for Air India*, THE INDIAN EXPRESS (Sept. 7, 2018)).

[133]    *See Cairn* ECF No. 1-74, at 2 (Mihir Mishra, *Air India Privatization Will Level the Playing Field in India: IATA Chief*, ECONOMIC TIMES (Mar. 21, 2021)).

[134]    *See Cairn* ECF No. 1-36, at 9–10 (Comptroller and Auditor General, *Performance Audit Report* (Mar. 10, 2017)).

[135]    *See Cairn* ECF No. 1-75 (Ministry of Civ. Aviation, *Table Showing Grants-in-Aid by Ministry of Civil Aviation—Grantee Organisation for Financial Year 2020–21*).

[136]    *See Cairn* ECF No. 1-76, at 1-2 (*First VVIP Aircraft 'Air India One' for President, PM to Arrive Today*, THE TIMES OF INDIA (Oct. 1, 2020)).

[137]    *See Cairn* ECF No. 1-77, at 18 (excerpts of Notes on Demands for Grants 2013–2014, 2014–2015, 2016–2017, 2017–2018, 2018–2019, 2019–2020, 2021–2022).

111.    **Fourth**, India has also provided loans to Air India on non-commercial and highly favorable terms.  For example, in the 2020-2021 fiscal year, the National Small Saving Fund ("NSSF") loaned Air India Rs 45 billion (US $612 million).[138]  An Air India official described the loan as "about 0.5 per cent cheaper compared to commercial banks."[139]

112.    **Fifth**, unlike private airlines, Air India enjoys special treatment under Indian tax law, which allows it to carry forward indefinitely unabsorbed depreciation into future years.[140] Because Air India has been unfailingly operating at a loss under India's mismanagement since its 2007 merger with Indian Airlines, it has not made any taxable income and therefore has not paid any income tax to the government.  As of March 31, 2020, the company had a total deferred tax asset of Rs 200.74 billion (US $2.73 billion), consisting of Rs 89.83 billion (US $1.22 billion) of brought forward losses, as well as unabsorbed depreciation and other temporary differences, all of which will be offset against future tax liabilities as contemplated in its 2019–2020 annual report.[141]

## 2.    *India Controls Air India's Access to Other Sources of Funding.*

113.    Even where Air India obtains income from sources other than India, India controls those revenue streams in two respects.  First, Air India obtains more favorable commercial loans thanks to Indian government guarantees.  Second, India dictates Air India's fares.

---

[138]    *See Cairn* ECF No. 1-13, at 59 (Lok Sabha Question AU662 (Feb. 4, 2021)). The NSSF is a fund administered by the Department of Economic Affairs of the Ministry of Finance pursuant to the National Small Savings Fund (Custody and Investment) Rules, 2001, and was established in 1999 to consolidate collections from the public under various "small saving schemes" floated by India.

[139]    *Cairn* ECF No. 1-78, at 1 (*Air India Seeks Govt Nod for Rs 2,400 Crore Loan from NSSF*, LIVEMINT (May 29, 2019)).

[140]    *See Cairn* ECF No. 1-79 (*Tax Act Amended for Air India, Indian Merger*, AVIATION INDIA (Feb. 17, 2017)).

[141]    *See Cairn* ECF No. 1-56, at 186 (excerpts of 2019–2020 Air India Annual Report) ("Further, the Deferred Tax Assets have been created against carry forward Depreciation *only which are available to the Company indefinitely* as per the provisions of the Income Tax Act.") (emphasis added).

114.     *India routinely guarantees loans and other payment obligations for Air India*. India's financial rules allow it to act as guarantor to enable Air India to raise financing "at lower interest [rates] or on more favourable terms."[142]   As of March 2020, India had agreed to guarantee amounts up to Rs 783.60 billion (US $10.66 billion).[143]

115.     Between March 2008 and March 2020, Air India's total outstanding government guarantees ranged in value between Rs 45.82 billion (US $1.14 billion)[144] in 2008 to Rs 428.97 billion (US $5.79 billion)[145] in 2020.[146]   During the fiscal year 2020–2021, India guaranteed additional loans to Air India—totaling Rs 9.64 billion (US $122.73 million).[147]

116.     Although under India's financial rules, the government must be paid a guarantee fee in exchange for its guaranteeing loans, Air India does not pay those fees.[148]   By March 2020, Air India had accrued Rs 18,275.0 million (US $248.7 million) in guarantee fees,[149] all of which have since been forgiven by India in an attempt to make Air India an attractive asset for buyers.[150]

---

[142]   *Cairn* ECF No. 1-80, Rule 276(ii) (Ministry of Finance's General Financial Rules (2017)).

[143]   *See Cairn* ECF No. 1-81, at 5–8 (excerpts of Detailed Demand for Grants of Ministry for Civil Aviation for 2009–2010, 2021–2022).

[144]   The USD figure is based on average exchange rate for Rs-USD in 2007–2008.

[145]   The USD figure is based on average exchange rate for Rs-USD in 2019–2020.

[146]   *See Cairn* ECF No. 1-81, at 2-3, 5-8 (excerpts of Detailed Demand for Grants of Ministry for Civil Aviation for 2009–2010, 2021–2022).

[147]   *See Cairn* ECF No. 1-13, at 60–61 (Lok Sabha Question 4894 (Mar. 25, 2021)).

[148]   *See Cairn* ECF No. 1-6, at 2 (MoCA Public Accounts Committee (2006–2007), Thirteenth Report: Non-Recovery of Guarantee Fee from Air India and Indian Airlines (Aug. 7, 2006)).

[149]   *See Cairn* ECF No. 1-56, at 155 (excerpts of 2019–2020 Air India Annual Report).

[150]   *See Cairn* ECF No. 1-82, at 1 (Mihir Mishra, *Govt offers Air India with Loan Against Aircraft of Rs 23,286 Crore*, ECONOMIC TIMES (Jan. 27, 2020)); *Cairn* ECF No. 1-83, at 80 (MoCA, Preliminary Information Memorandum for Inviting Expression of Interest for Strategic Disinvestment of Air India Limited, including

117.    Even after India halted capital contributions and began discussing divestment from Air India, it continued to guarantee Air India's loans.[151]   In the 2020–2021 fiscal year, India contributed no capital but it did extend guarantee support of Rs 9.6 billion (around US $127 million), "which was used to raise new working capital loans"[152] and to refinance, rolled-over bridge loans where the lenders were "not in agreement to further extend these . . . facilities."[153]

118.    ***India controls other sources of Air India's income.*** India has the right, under Section 129 of Air India's Articles of Association and the Instrument of Delegation of Financial Powers to set Air India's fares.[154]   In fact, Air India has been operating flights connecting smaller Indian towns at a $35 price cap as "insisted" by the Indian Prime Minister—a politically popular yet economically unviable model for operating these short-haul flights.[155]

### 3.  *India Controls Air India's Spending and Oversees Its Financial Situation.*

119.    India also exerts control over Air India's spending and closely monitors its financial state and accounts.   MoCA has the power to approve "all project[s] for acquisition of Aircraft / Engines / Simulator[s] / APUs" and other purchases that "require Capital Expenditure."[156]

---

AI's Shareholding Interest in the AIXL and AISATS (Jan. 27, 2020)) (all contingent liability confirmed against Air India for "Guarantee Fee/Penal charges due to [the Government of India]" will be indemnified by the Government).

[151]   *See Cairn* ECF No. 1-84, at 2 (Alfred Chua, *Civil Aviation Minister Forecasts Bleak 2020 Results for Air India*, FLIGHT GLOBAL (Mar. 28, 2021)).

[152]   *Id.*

[153]   *See Cairn* ECF No. 1-56, at 27 (excerpts of 2019–2020 Air India Annual Report).

[154]   *See Cairn* ECF No. 1-10, § 129(4) (Air India Articles of Association) ("*Subject to any statutory provisions and regulations or rules prescribed by the Government*, the Board shall be competent to determine the fares and the rates for any or all sectors") (emphasis added).

[155]   *See Cairn* ECF No. 1-86 (Mihr Sharma, *Why India's Airlines Fail to Take Off*, BANGKOK POST (Dec. 3, 2018)).

[156]   *See Cairn* ECF No. 1-85, § 3.3 (Instrument of Delegation of Financial Powers of Air India Ltd.).

120.    Further, any investments made by Air India must be in compliance with guidelines issued by the "Department of Public Enterprises, Ministry of Heavy Industries & Public Enterprises or any other authority of Government of India with regard to investment to be made by the Public Sector Undertakings."[157]   Wages paid to Air India's employees must be "in accordance" with guidelines issued by the Department of Public Enterprises, and while Air India has notional autonomy in employee matters, India routinely interferes in such matters.[158] Constitutional limitations against discrimination also apply to Air India's employment decisions as though it were an arm of the government.[159]

**F.  India Uses Air India's Property as Its Own.**

121.    India treats Air India as its own personal airline service and refuses to respect corporate formalities with respect to Air India's assets.

122.    India routinely receives air transportation from Air India for which it does not pay. Even though Air India has operated at a loss every year since the 2007 merger, in 2020 MoCA required Air India to upgrade tickets for all former Secretaries of the MoCA and their families.[160] All official travel by government officials is done through Air India, absent written authorization

---

[157]  *Id.* § 22.

[158]  *See also Cairn* ECF No. 1-56, at 180 (excerpts of 2019–2020 Air India Annual Report) ("In view of Department of Public Enterprises (DPE) guidelines applicable to PSUs no wage revision can be granted to the employees of loss-making PSUs. The Company has been making losses since 1st January 2007 hence no provision has been made towards wage revision/settlement.").

[159]  Article 12 of the Indian Constitution defines the "State" to include authorities "under the control of the Government of India."  *See infra* Section V(G).

[160]  *See Cairn* ECF No. 1-9, at xiv (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

of a senior government officer.[161]   The government rarely makes on-time payments due to Air India in spite of the airline's financial difficulties,[162] and does not pay interest to Air India on delayed payments.[163]   As of December 2019, for example, India owed Rs 4.58 billion (US $62.33 million) to Air India solely for the cost of the Prime Minister's travel, and Rs 2.43 billion (US $33.07 million) for the cost of travel by the President of India.[164]   As of February 2021, India owed Air India nearly Rs 5 billion (US $68.05 million) in airfare for flights of government "VVIP[s]" ("very, very important persons") at a time when Air India was forced to borrow Rs 2.25 billion through a short-term loan facility to refinance an earlier loan.[165]

123.   As a result of the state's interference and cavalier attitude towards Air India's finances, Air India has not once turned a profit since its 2007 merger.[166]   Its losses for this past year are estimated to be between Rs 95–100 billion (US $1.2-1.3 billion), up from Rs 80 billion (US $1 billion) the previous year.[167]   Air India is able to stay in business only because India

---

[161]   *See Cairn* ECF No. 1-7, ¶ 2.15 (MoCA Public Undertakings Committee (2009–2010), Fourth Report: National Aviation Co of India Ltd.-Merged Entity of Erstwhile Air India and Indian Airlines (Jan. 20, 2010)).

[162]   *See Cairn* ECF No. 1-9, at xxi (Comptroller and Auditor General, *Performance Audit Report* (Sept. 11, 2011)).

[163]   *See Cairn* ECF No. 113, at 58 (Lok Sabha Question 649 (Feb. 4, 2021)).

[164]   *See Cairn* ECF No. 1-87, at 1-2 (Soni Mishra, *Govt Owes Air India Rs 798 Crore; More Than Half of It for PM's Travel*, THE WEEK, (Dec. 2, 2019)).

[165]   Boykin Decl. Ex. 12 (Rhik Kundu, *Centre Owes Air India Nearly Rs 500 Crore for VVIP Flights*, HINDUSTAN TIMES(Feb. 5, 2021)); *see also Cairn* ECF No. 1-36, at 19-20 (Comptroller and Auditor General, *Performance Audit Report* (Mar. 10, 2017)).

[166]   *See Cairn* ECF No. 1-89, at 3 (Rhik Kundu, *Air India Set to Post Record Loss in FY21 on Pandemic Woes*, MINT (Feb. 8, 2021)).

[167]   *See id.*, at 2.

subsidizes its losses[168] and routinely guarantees its debts.[169]  The situation is now sufficiently dire that India's present Minister of Civil Aviation has publicly claimed: "Air India is a first-rate asset but has an accumulated debt of Rs 60,000 Crore."[170]  In a response to a recent question in Parliament, MoCA estimated Air India's losses during 2020–2021 to be in excess of Rs 97 billion (US $ 1.3 billion).[171]  Air India's independent auditors have likewise questioned "the ability of the Company to continue as a going concern" in light of the "complete erosion of the net worth of the Company."[172]

124.    India also assumes Air India's debts directly.  In 2019, the government transferred half of Air India's debt (Rs 294.64 billion of Rs 582.55 billion total, or US $4 billion to $7.92 billion) to AIAH, the SPV established by India to offload Air India's debt.[173]  The government will ultimately absorb these debts.[174]

---

[168]  *See Cairn* ECF No. 1-90, at 2 (Garga Chatterjee, *Air India's Hidden Subsidy Shows That the Govt Uses the Company Merely as a Political Tool*, FIRSTPOST (July 31, 2016)).

[169]  *See Cairn* ECF No. 1-89, at 3-4 (Rhik Kundu, *Air India Set to Post Record Loss in FY21 on Pandemic Woes*, MINT (Feb. 8, 2021)).

[170]  *Cairn* ECF No. 1-91, at 1 (*'Choice Between Disinvestment or Closing Down': Hardeep Purl Announces 100% Privatisation of Air India*, NEW INDIA (Mar. 27, 2021)); *see also Cairn* ECF No. 1, at 3 (*Financial Bids Will Be Invited in Coming Days for Air India Sale: Puri*, THE HINDU (Mar. 26, 2021))("[the Government of India's] mismanagement [of Air India] has resulted in cumulative debt of ₹ 60,000 crore.")

[171]  *See Cairn* ECF No. 1-13, at 63 (Lok Sabha Question 5018).

[172]  *See Cairn* ECF No. 1-56, at 58 (excerpts of 2019–2020 Air India Annual Report).

[173]  *See Cairn* ECF No. 1-93, at 2 (Anirudh Laskar & Rhik Kundu, *Tata, Govt Iron Out Differences over Air India*, AVIATION PROS (Apr. 5, 2021)).

[174]  *See Cairn* ECF No. 1-94, at 5 (ICRA, *Air India Assets Holding Limited: Rating Reaffirmed* (Feb. 2, 2021)); *see also* ECF No. 1-56, at 188 (excerpts of 2019–2020 Air India Annual Report) (stating that India may assume even more debt).

125.     Further, India declines to respect corporate formalities with regards to Air India's assets.  India transferred most of Air India's real estate assets to AIAH,[175] and is in the process of selling Air India's many valuable real estate assets.[176]  The Ministry of Housing and Urban Affairs is responsible for selling some of these properties, and the proceeds will be transferred to AIAH.[177] This process was initially overseen by a committee made up of a Supreme Court justice, a retired Auditor General, and a retired civil servant, and all sales are approved by the Cabinet.[178]  The government, rather than the company, appointed consultants to ascertain the value of these properties to determine which properties should be sold.[179]

### G. India's Own Courts Have Held that Air India Is One and the Same with the State.[180]

126.     Air India is considered to be the "State" under Indian law.

127.     Articles 12 through 35 of the Indian Constitution require the "State" to respect various fundamental rights.  Article 12 defines the "State" to include (a) the central government of India and the local state governments; (b) Parliament and the state legislatures; (c) all local authorities; and (d) "other authorities within the territory of India, or *under the control of the*

---

[175]  *See Cairn* ECF No. 1-93, at 2 (Anirudh Laskar & Rhik Kundu, *Tata, Govt Iron Out Differences over Air India*, AVIATION PROS (Apr. 5, 2021)).

[176]  *See Cairn* ECF No. 1-13, at 37-38 (Lok Sabha Question 1139 (Dec. 21, 2017)).

[177]  *See Cairn* ECF No. 1-56, at 156-57 (excerpts of 2019–2020 Air India Annual Report).

[178]  *See Cairn* ECF No. 1-13, at 37-38 (Lok Sabha Question 1139 (Dec. 21, 2017)); *id.* at 19-20 (Lok Sabha Question 3365 (Aug. 10, 2015)).

[179]  *Id.* at 42-43 (Lok Sabha Question 2722 (Aug. 2, 2018)).

[180]  Plaintiffs intend to raise an issue of Indian law as set forth in this section and hereby provide notice of same pursuant to Fed. R. Civ. P. 44.1.

*Government of India*."[181]  Under Indian law, corporations can be considered the "State" of India when they are "financially, functionally and administratively dominated by, or under the control of, the [g]overnment."[182]

128.    In *Lena Khan v. Union of India*, the Indian Supreme Court held that Air India was "a corporation which is for all purposes State within the meaning of the term as provided in Article 12 of Constitution of India," and thus required to respect constitutional rights.[183]  Other Indian courts have come to the same conclusion.[184]

129.    There is thus no reason to treat Air India as a separate juridical entity under US law when the courts of India, in interpreting Indian law, have concluded that Air India and the state are one and the same.

## VI.    India Has Demonstrated That It Does Not Intend to Honor the Award

130.    India's behavior demonstrates that it has no intention to honor the Award.  India has been taking steps to actively thwart attempts by Petitioners and others to recover payment due under several arbitration awards made against it.

131.    On January 18, 2021, Antrix petitioned the National Company Law Tribunal ("NCLT") in India to liquidate Devas based on allegations of fraud and illegality, allegations that

---

[181]   *Cairn* ECF No. 1-30 (excerpts of INDIA CONST., Art. 12) (emphasis added).

[182]   *Cairn* ECF No. 1-95, at 111 ¶ c (excerpts of *Pradeep Kumar Biswas v. Indian Inst. of Chemical Biology*, (2002) 5 SCC 111).

[183]   *See Cairn* ECF No. 1-96 ¶ 10 (*Lena Khan v. Union of India*, (1987) 2 SCC 402).

[184]   *See, e.g.*, *Cairn* ECF No. 1-97 ¶ 49 (*Jeetendra Krishna Verma v. Air India Limited*, (2019) LLR (SN 49) 777); *Cairn* ECF No. 1-98 ¶ 3 (*Rakesh Rai v. National Aviation Company of India*, (2013) W.P No. 287).

are being raised now for the first time.[185]  As Judge Zilly of the Western District of Washington has observed, "throughout the duration of . . . the underlying arbitration proceedings in India, [Antrix] never once argued before the ICC panel that it was entitled to repudiate the Agreement on the basis of fraud or corruption."[186]

132.    The NCLT granted Antrix's petition and appointed a provisional liquidator, who promptly fired Devas' global counsel.[187]  Devas shareholders immediately sought to intervene in the enforcement action against Antrix in the Western District of Washington in order to advocate for Devas' interests.[188]  In that action, Devas shareholders assert that India has been attempting to "demolish" Devas and "has also been secreting assets out of Antrix to NewSpace," a newly formed company that is wholly owned by India and under the direct control of the Indian Department of Space.[189]  The shareholders assert that Antrix, aided by India, is clearly attempting "to dodge and duck the arbitral awards" issued against it.[190]  The district court has ordered Antrix to comply with discovery requests to obtain information on Antrix's assets and asset transfers as well as information on its relationship with India and NewSpace, in particular, information that may demonstrate that Antrix and NewSpace are alter egos of India.[191]

---

[185]    *Antrix* ECF No. 133, at 2 (Order (Aug. 16, 2021)).

[186]    *Antrix* ECF No. 108, at 7, n.4 (Order on Limited Remand (Mar. 29, 2021)).

[187]    *Antrix* ECF No. 133, at 2 (Order (Aug. 16, 2021)).

[188]    *Id*. at 2.

[189]    *Antrix* ECF No. 112, at 7 (Devas Shareholders Motion to Compel Discovery (July 6, 2021)).

[190]    *Id*. at 4.

[191]    *Antrix* ECF No. 133, at 21-22 (Order (Aug. 16, 2021)).

133.    In yet another attempt to avoid its obligations, India has decided to privatize Air India and recently announced that it had reached an agreement to sell its entire stake in Air India to Tata Sons,[192] the principal holding company of the Tata Group.  India has acknowledged the potential impact of the sale on the on-going enforcement actions and yet continues to move forward with the sale.[193]   Recent reports suggest that the bid submitted from Tata Sons included an indemnity clause,[194] which has presumably been incorporated into the final agreement.

## LEGAL STANDARD AND ARGUMENT

**VII.    The Award Should Be Confirmed**

**A.  The New York Convention applies to the Award**

134.    The New York Convention applies "to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  New York Convention, Art. I(1).  The United States is a party to the New York Convention, subject to the reservation that it applies the Convention "on the basis of reciprocity, to the recognition and enforcement only of those awards made in the territory of another Contracting State."  Declaration of the United States of America, Sept. 30, 1970, 21 U.S.T. 2566, 751 U.N.T.S. 398.  The Award was made in Switzerland.  Boykin Decl. Ex. 1, Award, at

---

[192]    Boykin Decl. Ex. 13 (Tata Press Release, "Tata Group to Acquire 100% State in Air India" (Oct. 8, 2021)); *see also* Boykin Decl. Ex. 16 (*Air India: Tata Sons conglomerate seals $2.4bn takeover deal*, THE GUARDIAN (Oct. 8, 2021)) and Boykin Dec. Ex. 17 (*Tata regains control of troubled Air India with a $2.4 billion bid*, CNBC (Oct. 8, 2021)).

[193]    Boykin Decl. Ex. 14 (*Cairn, Devas lawsuits to not impact Air India Divestment: Govt*, BUSINESS TODAY (Sept. 24, 2021)).

[194]    Boykin Decl. Ex. 15 (*Air India disinvestment: Tata Sons wins bid for national carrier*, INDIA TODAY (Oct. 1, 2021)).

125.     Switzerland is also party to the New York Convention.    Ratification Instrument of Switzerland, June 1, 1965, 536 U.N.T.S. 477.

135.     The FAA, for its part, provides that the Convention applies to an arbitration award if the underlying commercial relationship involves at least one party that is not a United States citizen, or the relationship "involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202.  The underlying commercial relationship here is between a German party and an Indian party, and concerns an investment in India and an arbitral award rendered in Switzerland.

136.     Thus, the New York Convention applies to the Award.

### B.  The Grounds for Refusing to Confirm an Award under the Convention Are Extremely Narrow

137.     While courts of the country in which (or under the arbitration law of which) an award was made have 'primary jurisdiction' over the award, under the Convention United States courts have secondary jurisdiction over a foreign award, and as a result lack subject matter jurisdiction to vacate, set aside, or modify foreign awards.  *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 368 (2d Cir. 2003) ("In contrast to the limited authority of secondary-jurisdiction courts to review the arbitral award, courts of primary jurisdiction . . . have much broader discretion to set aside an award.").

138.     The FAA provides that, in proceedings to confirm a foreign award under the Convention, "the court shall confirm the award, unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C.

§ 207.[195] This Circuit has recognized that judicial review of an arbitral award under the Convention is extremely limited. *Thai-Lao Lignite (Thailand) Co., v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 178 (2d Cir. 2017) ("The Convention conceives of a secondary jurisdiction's review of an award as relatively limited"). "'To avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation,'

---

[195]   These grounds are listed in Article V of the Convention:

1.   Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

    (a)   The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law, of the country where the award was made; or

    (b)   The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

    (c)   The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decision on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

    (d)   The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

    (e)   The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority in which, or under the law of which, that award was made.

2.   Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition is sought finds that:

    (a)   The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

    (b)   The recognition or enforcement of the award would be contrary to the public policy of that country.

arbitral awards 'are subject to very **limited** review.'" *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 587 (2d Cir. 2016) (quoting *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) (emphasis added)).  "[C]onfirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.'" *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (quoting *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)); *Vector Media Group, Inc. v. MyLocker.com, LLC*, 2020 WL 5371195 (S.D.NY. Sept. 8, 2020) (explaining that a court "must grant [an] award unless the award is vacated, modified, or corrected.") (internal quotations marks omitted)).

139.    Furthermore, the burden of proof is on the party who seeks to oppose confirmation. *D.H. Blair v. Gottdiener*, 462 F.3d at 110 ("A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."); *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007) ("[T]he party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses . . . applies").  Courts will not second guess an arbitrator's determinations of facts and law, even if incorrect.  *D.H. Blair v. Gottdiener*, 462 F.3d at 110 ("The arbitrator's rationale for an award need not be explained, and the award should be confirmed 'if a ground for the arbitrator's decision can be inferred from the facts of the case.'") (quoting *Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir. 1991)); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (noting that courts generally refuse to "second guess an arbitrator's resolution" and that an arbitrator's decision "is entitled to substantial deference"); *Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Intern. Union, AFL-CIO*, 954 F.2d 794, 797 (2d Cir. 1992) (internal quotation marks omitted) ("[A]n arbitration award should be enforced, despite a court's disagreement with it on the

merits, if there is 'a barely colorable justification for the outcome reached.'") (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir.1978)).

### C.  There is No Reason Not to Confirm the Award

140.    None of the grounds for refusing or deferring confirmation is present here.  The Tribunal's jurisdiction under the Treaty was confirmed not only in the Interim Award, but also in the Swiss Federal Supreme Court's thorough decision refusing to set aside the Interim Award. India participated actively in the arbitral proceedings and was afforded full due process.  The Tribunal was constituted in accordance with the parties' agreement in Article 9(2)(b)(i) of the Treaty, and the parties had the benefit of having their dispute adjudicated by three of the most eminent international arbitrators in the world.

141.    The Award is final and binding on the Parties.  India failed to challenge the Award before the Swiss Federal Supreme Court.  It is not surprising that India elected not to do so; as described above, the Tribunal applied India's valuation methodology to determine the compensation due to Petitioner.  In any event, the proper forum for India to challenge any aspect of the Award was the Swiss Federal Supreme Court.  It chose not do so and this Court should not permit India to raise issues in these recognition proceedings that it deliberately chose not to present to the Swiss court, which was the court with primary jurisdiction over the arbitration and "competent authority" within the meaning of Article V(1)(e) of the New York Convention and thus the only court with authority to vacate, modify, or set aside the Award.  On August 20, 2020,

the Civil Court for the Republic and Canton of Geneva issued a Certificate of Enforceability of the Award.[196]

142.   Finally, U.S. law readily recognizes the use of investor-state treaty arbitration to settle pecuniary claims arising out of a state's sovereign misconduct towards a foreign investment, and recognition of the Award would not be contrary to any applicable U.S. public policy. *Corporación Mexicana de Mantenimiento Integral, S. De R.L. De. C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 106 (2d Cir. 2016) (internal quotation marks omitted) ("The public policy exception does not swallow the rule: the standard is high, and infrequently met").

143.   Accordingly, India cannot meet its heavy burden of demonstrating that it has any defense to confirmation of the Award.

### D.  The Award Can Be Enforced Against Air India as An Alter Ego of India

144.   The Second Circuit has held that an arbitration award can be enforced against a third party under an alter ego theory of liability.  *CBF Indústria de Gusa S/A v. AMCI Holdings Inc.*, 850 F.3d 58 (2nd Cir. 2017).  In *de Gusa*, a group of Brazilian companies sought to enforce an arbitration award issued under the auspices of the International Chamber of Commerce ("ICC") against defendants, who were not parties to the ICC arbitration or mentioned in the award, under an alter ego theory of liability.  *Id*. at 63.  The district court initially dismissed the plaintiffs' claims, requiring plaintiffs to "first confirm the Award against [the defendant in the ICC arbitration] before

---

[196]   In any event, a pending vacatur proceeding is not a bar to confirmation of an arbitral award.  The Second Circuit has developed factors for courts in this district to consider when faced with such a scenario.  *Europcar Italia, S.p.A. v. Maiellano Tours, Inc*., 156 F.3d 310, 317-18 (2d Cir. 1998) (noting that "a stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost the arbitration").

seeking to enforce the Award against Defendants." *CBF Indústria de Gusa S/A v. AMCI Holdings Inc.*, 316 F.Supp.3d 635, 643 (S.D.N.Y. 2018).

145. On appeal, the Second Circuit reversed the district court, explaining that "the district court erred in holding that appellants were required to confirm their foreign arbitral award before they would be allowed to enforce it," including against an alter ego. *de Gusa*, 850 F.3d at 74. The Second Circuit remanded the case to the district court with the following instructions:

> On remand, therefore, we instruct the district court to evaluate appellants' Enforcement Action, particularly appellants' efforts to reach appellees as alter-egos . . . under the standards set out in the New York Convention . . . and applicable law in the Southern District of New York. . . . [T]he question of whether a third party not named in an arbitral award may have that award enforced against it under a theory of alter-ego liability, or any other legal principle concerning the enforcement of awards or judgements, is one left to the law of the enforcing jurisdiction, here the Southern District of New York, under the terms of Article III of the New York Convention.

*Id*. at 75; *see also Kensington Intern. Ltd. v. Republic of Congo*, 2007 WL 1032269, at *7-12 (S.D.N.Y. Mar. 30, 2007) (allowing plaintiff to bring action against purported alter-ego of the Congo to enforce a foreign judgment against the Congo).

146. Under the law of this Circuit, there is no doubt that Petitioner is entitled to bring this petition to enforce against Air India under an alter ego theory of liability and that this action may proceed in parallel with the petition to enforce the Award against India. The facts detailed above more than satisfy the *Bancec* standard for alter ego liability. They establish that Air India is so extensively controlled by India that a principal and agent relationship exists. Further, recognizing that Air India has a separate entity would work an injustice upon Petitioner by allowing India to evade its obligations under the Award.

## COUNT I

### (Petition to Enforce the Award Against Air India)

147.    Petitioner repeats and re-alleges each and every allegation of Paragraphs 1 through 146 of this Petition and Complaint as though set forth herein.

148.    Petitioner seeks an order recognizing and confirming in its entirety the Award issued on May 27, 2020 against Air India.

149.    Air India is the "State" under Indian law.

150.    An instrumentality like Air India is the alter ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between them, or where giving effect to the nominal separateness of the instrumentality would work a fraud or injustice.

151.    India undoubtedly controls Air India, as demonstrated by the facts set forth above. Furthermore, the nominal distinction between India and Air India is illusory and serves only to aid India in improperly shielding its assets from creditors like Petitioner.  Giving effect to Air India's nominal separateness from India would unjustly deprive Petitioner of the ability to recover assets located in the District that, though nominally held by Air India, are actually controlled by India.

152.    The Award is therefore enforceable against Air India.

## COUNT II

### (For Declaratory Judgment)

153.    Petitioner repeats and re-alleges each and every allegation of Paragraphs 1 through 146 of this Petition and Complaint as set forth herein.

154.    Petitioner seeks a declaration that Air India is an alter ego of India, that Air India is liable to Petitioner for India's debts; and that Petitioner may execute judgments against India on Air India's assets.

155.    Air India is the "State" under Indian law.

156.    An instrumentality like Air India is the alter ego of its parent state when the parent state controls the instrumentality so extensively that a principal-agent relationship exists between them, or where giving effect to the nominal separateness of the instrumentality would work a fraud or injustice.

157.    India undoubtedly controls Air India, as demonstrated by the facts set forth above. Furthermore, the nominal distinction between India and Air India is illusory and serves only to aid India in improperly shielding its assets from creditors like Petitioner.  Giving effect to Air India's nominal separateness from India would unjustly deprive Petitioner of the ability to recover assets located in the District that, though nominally held by Air India, are actually controlled by India.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests judgment against Respondent be entered as follows:

a.    Recognizing and confirming in its entirety the Award issued on May 27, 2020, pursuant to Article III of the New York Convention and 9 U.S.C. § 207;

b.    Judgment for Petitioner in the amount of USD 93,300,000 in damages, plus interest on that amount as provided for by paragraph 357(a) of the Award "until payment in full";

c.    Judgment for Petitioner in the amount of USD 8,271,765 representing the value in U.S. dollars of the costs and attorneys' fees awarded to Petitioner in the Award

(GBP 5,250,011.70, EUR 33,977.00, and USD 10,000.00 and attorneys' fees and related costs, and EUR 730,272.32 in arbitration costs, all converted to USD based on exchange rates as of the date of this petition), plus interest on that amount accruing as provided for by paragraph 357(c) of the Award "until payment in full";

d.  Directing that post judgment interest shall accrue "until payment in full" of the above amounts as provided for in paragraph 357 of the Award;

e.  Declaring pursuant to 28 U.S.C. § 2201 that Air India is the alter ego of India and legally indistinct from the State itself;

f.  Adjudging that Air India shall be jointly and severally liable for the judgment awarded to Petitioner based on the Award;

g.  Awarding money damages against Air India in the amounts specified in (b), (c), and (d), above;

h.  Allowing execution, attachment, and other orders as appropriate under State and federal law including orders for injunctive relief, requiring Air India to satisfy the liability owed to Petitioner; and

i.  Granting such other and further relief as the Court may deem just and proper.

Dated: November 4, 2021

Respectfully submitted,

HUGHES HUBBARD AND REED LLP

<u>        /s/ Derek J.T. Adler        </u>
Derek J.T. Adler
Malik Havalic
One Battery Park Plaza
New York, New York 10004-1482
Tel: (212) 837-6086
Fax: (212) 299-6086
Email: derek.adler@hugheshubbard.com
Email: malik.havalic@hugheshubbard.com

James Boykin (*pro hac vice forthcoming*)
Shayda Vance (*petition for admission pending*)
1775 I Street, N.W.
Washington, D.C., 20006-2401
Tel: (202) 721-4751
Fax: (202) 729-4751
Email: james.boykin@hugheshubbard.com
Email: shayda.vance@hugheshubbard.com

*Attorneys for Petitioner*